14 A.3d 36

LAWRENCE B. SEIDMAN AND SEIDMAN AND ASSOCIATES, L.L.C., PLAINTIFFS-APPELLANTS, v. CLIFTON SAVINGS BANK, S.L.A., JOHN A. CELENTANO, JR., RAYMOND L. SISCO, FRANK J. HAHOFER, THOMAS A. MILLER, JOHN H. PETO, JOSEPH C. SMITH, JOHN STOKES, AND CLIFTON SAVINGS BANCORP., INC., DEFENDANTS-RESPONDENTS.

Argued January 5, 2011—Decided March 16, 2011.

152

*Peter R. Bray* argued the cause for appellants (*Bray, Miller & Bray*, attorneys; *Pashman Stein*, of counsel).

*Richard A. Beran* argued the cause for respondents (*McCarter & English*, attorneys; *Michael M. Horn*, of counsel; *Mr. Beran* and *Steven A. Beckelman*, on the briefs).

Justice RIVERA–SOTO delivered the opinion of the Court.

This appeal requires that we revisit a long-standing rule concerning corporate governance matters and how, in its application, corporate actions are to be gauged. That rule is set forth plainly in *Eliasberg v. Standard Oil Co.*, 23 *N.J.Super.* 431, 92 *A.*2d 862 (Ch.Div.1952), *aff'd o.b.*, 12 *N.J.* 467, 97 *A.*2d 437 (1953). Commonly referred to as the business judgment rule, it provides that, once the shareholders approve or ratify a proposed corporate action, a court's scope of review of the transaction is limited: "the court will look into the transaction only far enough to see whether the terms are so unequal as to amount to waste, or whether on the other hand the question is such a close one as to call for the exercise of what is commonly called 'business judgment.' " *Id.* at 449, 92 *A.*2d 862. The distinction between whether an action constitutes corporate waste or is subject to the business judgment rule is one of substance: "In the former case, the court will reverse the decision of the stockholders; in the latter, it will not." *Ibid.*

Focusing on the adoption and execution of a management stock incentive plan, plaintiffs assert that the stockholders' approval of that plan was vitiated by the failure to fully and completely disclose one discrete fact: that the full amount of stock options and restricted stock grants that could be granted to each of the members of the corporation's board of directors in fact would be granted to them. Defendants, on the other hand, reply that the disclosures made to stockholders in respect of the plan were fair

and complete, and that disclosure of the specific stock option allocations or the specific stock awards to be made to individual directors in the future, once the plan was approved, was not required.

Applying the business judgment rule and the doctrine of waste, both the trial court and the Appellate Division dismissed plaintiffs' claims in respect of the stock option plan. We agree. In doing so, we reaffirm the rule of *Eliasberg* and reject plaintiffs' invitation to limit the scope of the business judgment rule.

## I.

### *Background*

The history of defendant Clifton Savings Bank, S.L.A. (Bank) is long and rich. Started in 1928 as the Botany Building & Loan Association in Clifton, a New Jersey state-chartered mutual savings and loan association, and later becoming one of the first savings and loan institutions in the United States to be approved by and given full insurance coverage by the Federal Savings & Loan Insurance Corporation (FSLIC), the Bank became Clifton Savings & Loan Association in 1954 and, in 1989, was renamed to its current name. In 2004, the Bank reorganized from a state-chartered mutual savings and loan association to a state-chartered stock savings and loan association. *See generally,* New Jersey Savings and Loan Act (1963), *N.J.S.A.* 17:12B–1 to –319. As a result of that reorganization, the Bank's issued and outstanding stock was held by Clifton Savings Bancorp., Inc. (Bancorp), a publicly traded corporation listed on the NASDAQ.[1] In turn, approximately fifty-five percent of Bancorp's stock is held by

---

[1] Now known exclusively by its acronym, it was originally titled the "National Association of Securities Dealers Automated Quotations" system, and is "[a] computerized system for recording transactions and displaying price quotations for a group of actively traded securities on the over-the-counter market." *Black's Law Dictionary* 1121–22 (9th ed. 2009).

Clifton MHC, a federal mutual holding company,[2] and the remainder was sold to the public. Finally, in 2007, the Bank converted from a state-chartered savings and loan association into a federally chartered savings bank. *See N.J.S.A.* 17:12B–222 to –225.

In 1998, while the Bank was still a state-chartered mutual savings and loan association, plaintiff Lawrence B. Seidman became a depositor at—and, because the Bank then was a mutual savings and loan association, a member of—the Bank. Through the 2004 reorganization, the members of the Bank were converted into stockholders of Bancorp; in this process, Seidman also became a stockholder of Bancorp, a status he maintained until November 2004.[3]

### Adoption and Implementation of the 2005 Plan

Bancorp scheduled its 2005 annual meeting of stockholders for July 14, 2005. In connection therewith, Bancorp issued a notice of annual meeting and proxy statement to its stockholders, including Seidman. The notice of the annual meeting of stockholders conspicuously noted that the stockholders would be asked to

---

[2] The federal legislation that authorized the conversion of the Bank into its new structure allows, among other alternatives, that the stock of the converted bank be held by a mutual holding company. *See* 12 *U.S.C.* § 1467a(*o*)(1) (providing that "[a] savings association operating in mutual form may reorganize so as to become a holding company by—(A) chartering an interim savings association, the stock of which is to be wholly owned, except as otherwise provided in this section, by the mutual association; and (B) transferring the substantial part of its assets and liabilities, including all of its insured liabilities, to the interim savings association").

[3] During the course of this litigation, Seidman acknowledged that he no longer was the record owner of Bancorp's stock, an event that would deprive him of standing. As a result, Seidman amended his complaint to add Seidman and Associates, L.L.C., a limited liability company where he served as managing partner, as a party plaintiff, asserting thereby that both he and the limited liability company retained standing to complain against defendants. The question of Seidman's individual standing as a party plaintiff, although raised below, was not adjudicated and, therefore, is not present in this appeal. For simplicity's sake, references to either Seidman or plaintiffs include both Seidman individually and his limited liability company.

"consider and act on . . . [t]he approval of [Bancorp's] 2005 Equity Incentive Plan [ (2005 Plan) ]." The accompanying proxy statement—which was subject to filing with and examination by the Securities and Exchange Commission (SEC) prior to its issuance [4] —contained an exhaustive summary of that plan, explained that the board of directors of Bancorp had "adopted the 2005 Plan, subject to stockholder approval," and attached a complete copy of the 2005 Plan as an appendix to the proxy statement.

In particular, the proxy statement identified four purposes for the proposal and adoption of the 2005 Plan. These were (1) "to attract and retain qualified personnel in key positions[;]" (2) to "provide officers, employees and non-employee directors of [Bancorp] and [the Bank] with a proprietary interest in [Bancorp] as an incentive to contribute to the success of [Bancorp;]" (3) to "promote the attention of management to other stockholder concerns[;]" and (4) to "reward employees for outstanding performance." It noted further that Bancorp "believes that stock-based incentive awards will further focus employees and directors on the dual objectives of creating stockholder value and promoting [Bancorp]'s success, and that the 2005 Plan will help to attract, retain

---

[4] However, "[t]he fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the [SEC] shall not be deemed a finding by the [SEC] that such material is accurate or complete or not false or misleading, or that the [SEC] has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made." 17 *C.F.R.* § 240.14a–9(b). That regulation draws its statutory authority from Section 26 of the Securities and Exchange Act of 1934, 15 *U.S.C.* § 78z ("No action or failure to act by the [SEC] in the administration of this title shall be construed to mean that [it] has in any way passed upon the merits of, or given approval to, any security or any transaction or transactions therein, nor shall such action or failure to act with regard to any statement or report filed with or examined by such authority pursuant to this title or rules and regulations thereunder, be deemed a finding by such authority that such statement or report is true and accurate on its face or that it is not false or misleading. It shall be unlawful to make, or cause to be made, to any prospective purchaser or seller of a security any representation that any such action or failure to act by any such authority is to be construed or has such effect.").

and motivate valued employees and directors." It emphasized that "the 2005 Plan will promote the interests of [Bancorp] and its stockholders and that it will give [Bancorp] flexibility to provide incentives based on the attainment of corporate objectives and increases in stockholder value."

In its summary description of the 2005 Plan, the proxy statement noted that the 2005 Plan would be administered by a compensation committee. It explained that stock awards under the 2005 Plan would consist of two types: grants of stock options, which "give[ ] the recipient the right to purchase shares of [Bancorp] common stock at a future date at a specified price per share[,]" and restricted stock awards, which are "grant[s] of a certain number of shares of common stock subject to the lapse of certain restrictions (such as continued service) determined by the [compensation c]ommittee." Specifically, the proxy statement noted that

the [compensation c]ommittee has broad authority under the 2005 Plan with respect to awards granted thereunder, including, without limitation, the authority to:

• select the individuals to receive awards under the 2005 Plan;

• determine the type, number, vesting requirements and other features and conditions of individual awards, including whether performance goals will be attached to awards; and

• interpret the 2005 Plan and award agreements issued with respect to individual awards [of stock options or restricted stock awards].

The proxy statement's summary description of the 2005 Plan further explained that there were limits on the aggregate amount of stock subject to stock options and/or restricted stock awards, and that, subject to the stockholders first approving the 2005 Plan and "[p]rior to making any awards under the 2005 Plan, the [compensation c]ommittee will consider all information it determines to be necessary in order to make appropriate grants, including surveys detailing grants made by similarly situated companies." It further noted that, in the usual process of determining compensation levels, "[t]he [compensation c]ommittee reviews comparative salaries paid by other financial institutions when establishing salaries and benefits for given positions and

intends to consider similar data when making awards." It repeated that, "[u]nder the terms of the 2005 Plan, the [compensation c]ommittee may consider, among other things, individual or [Bancorp] performance in making grants or as a condition of vesting for any grant."

Finally, the proxy statement conspicuously notes that "Clifton MHC, the mutual holding company for [Bancorp], owns 55.2% of the outstanding shares of common stock of [Bancorp;]" that "[a]ll shares of common stock owned by Clifton MHC will be voted in accordance with the instructions of the Board of Directors of Clifton MHC, the members of which are identical to the members of the Board of Directors of [Bancorp;]" and that "Clifton MHC is expected to vote such shares 'FOR'" approval of the 2005 Plan. That said, the proxy statement also makes clear that, in order for the 2005 Plan "[t]o be approved, this matter requires the affirmative vote of a majority of the votes eligible to be cast at the annual meeting, including the shares held by Clifton MHC ('Vote Standard A') *and* the affirmative vote of a majority of the votes cast at the annual meeting, *excluding the shares held by Clifton MHC* ('Vote Standard B')." (first emphasis in original; second emphasis supplied).[5]

Likewise, the version of the 2005 Plan attached to the proxy statement further set forth the details of the 2005 Plan. In addition to the matters described in the summary plan description

---

[5] The then-applicable regulations of the Office of Thrift Supervision (OTS) appeared to prevent a parent mutual holding company from voting to approve plans such as the 2005 Plan for one year after the bank conversion; in September 2004, OTS Chief Counsel interpreted the OTS regulation as imposing a permanent bar on voting by the mutual holding company. *See Voting Requirements For Benefit Plans Implemented After A Minority Stock Issuance In A Mutual Holding Company Structure,* Op. OTS Chief Counsel, P–2004–6, 2004 *WL* 3272090 (Sept. 17, 2004). The current regulation provides simply that, at any time six months after a conversion from a mutual to a stock bank, "shareholders must approve [stock option plans and/or management recognition plans] by a majority of the total votes eligible to be cast at a duly called meeting before [the converted bank may] establish or implement the plan." 12 *C.F.R.* § 563b.500(a)(6).

that is part of the proxy statement, the 2005 Plan made clear how the 2005 Plan was to be administered, the maximum number of shares available for either stock option grants or restricted stock awards, and, specifically, that the 2005 Plan "will comply with the requirements set forth in 12 *C.F.R.* [§] 575.8 and 12 *C.F.R.* [§] 563b.500." [6]

It is uncontested that the 2005 Plan was approved at the July 14, 2005 annual meeting of Bancorp's stockholders. Based on that approval, the compensation committee issued (1) grants of stock options to all seven of the members of Bancorp's board of directors and to twenty-two other employees of the Bank, and (2) restricted stock awards to the board members and to forty-two other employees of the Bank. In doing so, the compensation committee was guided by and complied with the relevant OTS regulations, which limit the issuance of stock awards in mutual savings and loan associations that convert to stock savings and loan associations under a mutual holding company structure: the board of directors, in the aggregate, cannot receive more than thirty percent of the awards, 12 *C.F.R.* § 563b.500(a)(5); no member of the board of directors may receive more than five percent of the awards, *ibid.;* and any award granted to an employee is capped at twenty-five percent of the awards that can be granted, 12 *C.F.R.* § 563b.500(a)(4). Also, the compensation committee "reviewed four different scenarios for granting the stock awards, and consulted with counsel, various Certified Public Accountants, and a compensation consultant before awarding the stock and stock options under the [2005] Plan."

### The Lawsuit and Trial

Following the awards under the 2005 Plan, Seidman filed a complaint in the General Equity Part of the Chancery Division [7]

---

[6] 12 *C.F.R.* § 575.8 sets forth the mandatory and optional provisions of stock issuance plans; 12 *C.F.R.* § 563b.500 describes specific limitations on stock option grants and restricted stock awards noted later in this opinion.

[7] *See* R. 4:3–1(a)(1).

alleging, among other things, that the stock option grants and restricted stock awards made to Bancorp's directors were "wrongful and improper[.]"[8] Specifically, he claimed that the "awards are clearly not designed to retain the services of the [director-defendants;]" that the "awards unduly and inappropriately reward the [director-defendants] without leaving sufficient shares and options available to attract new qualified people[;]" that, "[u]pon information and belief, these awards are not consistent with any study or survey[;]" and that "[t]hese awards constitute an unreasonably large portion of the net earnings of [Bancorp]."

A non-jury trial was conducted during the spring of 2007.[9] In its broadest strokes, the dispute centered on the effects of Bancorp's decision to convert from a state-chartered mutual savings and loan association to a state-chartered stock savings and loan association under the mutual holding company structure, and the actions taken as a result thereof. At its core, Seidman's complaint was that the Bank and Bancorp should have converted fully into a stock entity without the mutual holding company structure, and that the choice to convert Bancorp as it had was designed solely to benefit its insiders, and not for a proper corporate purpose.

[8] Seidman previously had commenced litigation against the defendants in respect of the Bank's conversion; that litigation ultimately was dismissed prior to the filing of Seidman's complaint in this case. In addition to alleging corporate waste in respect of the 2005 Plan, that latter complaint—which ultimately became Seidman's second amended complaint against the Bank, Bancorp and its directors—also claimed that the defendants had committed waste (1) in paying consulting fees to a member of the board of directors, (2) in paying excessive compensation to the chairman of the board of Bancorp, and (3) in approving and continuing a retirement plan for the directors. With the exception of the claim for waste concerning the consulting fees paid to a member of the board of directors, both the Chancery Court and the Appellate Division rejected Seidman's claims, and Seidman did not press those claims before this Court. Therefore, our review is limited solely to Seidman's claims in respect of the 2005 Plan.

[9] *See Brennan v. Orban*, 145 *N.J.* 282, 292, 678 A.2d 667 (1996) ("That the constitutional provision affording litigants the right of trial by jury did not extend to equitable actions in Chancery has long been understood. *Lyn–Anna Props. v. Harborview Dev. Corp.*, 145 *N.J.* 313, 321, 678 A.2d 683 (1996).").

### The Chancery Court's Decision

By an order and comprehensive letter opinion dated October 31, 2007, the Chancery Court dismissed Seidman's claims in respect of the 2005 Plan "for failure to meet the burden of proof[.]" It summarized succinctly the acrimony generated in this case:

> Plaintiff and defendants agree on very little in this matter, except that this litigation is about greed. Plaintiff alleges this is a story about officers and directors who took a bank half way through conversion in order to benefit themselves at the expense of shareholders and investors. The defendants argue it is the "activist investor" who wishes to see the bank fully converted so he and "his type" can cash out and take the cream from the bank in the process. From the opening statement and especially during the expert testimonies, as the basis for the experts' opinions on the subject of stock allowances, plaintiff kept emphasizing the directors['] and officers' age[s]. Defendants suggest that perhaps Seidman is driven by a discriminatory attitude towards older workers. Both sides used words such as "rewards" and "entitlements" sometimes pejoratively and occasionally to represent a valid concept. The testimonies demonstrated the clash of opposing banking philosophies.

The Chancery Court explained that "[t]o prove waste, plaintiff must show that compensation is 'so one sided that no business person of ordinary[, sound] judgment could conclude that the corporation has received adequate consideration.'" (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del.2000)). Relying on Delaware precedent, it quoted at length a passage from *Lewis v. Vogelstein*, 699 A.2d 327 (Del.Ch.1997); in its original version, that passage reads as follows:

> The judicial standard for determination of corporate waste is well developed. Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is any *substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude a post that the transaction was unreasonably risky. Any other rule would deter corporate boards from the optimal rational acceptance of risk, for reasons explained elsewhere. Courts are ill-fitted to attempt to weigh the "adequacy" of consideration under the waste standard or, *ex post*, to judge appropriate degrees of business risk.

[*Id.* at 336 (citations omitted).]

The trial court's decision underscored that "[t]he standard for a waste claim is high and the test is 'extreme ... very rarely satisfied by a shareholder plaintiff.'" (quoting *In re 3COM Corp. S'holders Litig.*, 1999 *WL* 1009210, *4, 1999 *Del. Ch. LEXIS* 215, *12 (Del. Ch. Oct. 25, 1999) (released for publication by the Court on Nov. 9, 1999; footnote omitted)). It continued:

> "To state a claim for waste, the plaintiff must allege facts to establish that the [corporate] directors authorized an exchange that was so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration. The transfer must either serve no corporate purpose or be so completely bereft of consideration that such transfer is in effect a gift."

> [ (quoting *id.* at *4, 1999 *Del. Ch. LEXIS* 215 at *13 (footnotes, internal quotation marks and editing marks omitted)).]

It further stated that "[t]he cases in Delaware and New Jersey are consistent in holding that to prove a waste claim, a shareholder plaintiff has to establish that an expense served absolutely no corporate benefit whatsoever." (citation and internal quotation marks omitted). It summed up by insisting that "[c]onsistently, the [c]ourts have held 'waste' is subject to a stringent proof standard [and t]rial [c]ourts are admonished not to substitute their judgment but to look to the business judgment rule as it applies to the action of the Boards."

Applying those standards, the Chancery Court determined that, in respect of Scidman's challenge to the 2005 Plan, one must "look to the plaintiff's burden in establishing 'waste.'" It reasoned that, if plaintiff satisfied that burden, "then the burden shifts [to Bancorp] to prove by clear and convincing evidence that [its] actions were not a result of self-dealing or a breach of fiduciary duty." Reviewing the proofs presented at trial in support of Bancorp's implementation of the 2005 Plan, it concluded that "the [d]irectors who testified before this Court lacked a certain amount of sophistication and ability to explain their actions." It noted that "[t]he [d]irectors took the maximum awards available to be allocated to them with the exception of the allocation they provided to [the chairman of Bancorp's board of directors] ... because they felt that was what he would 'like them to do.'" Although the

Chancery Court concluded that "plaintiff set out a prima facie case of 'waste' at the end of his case[, and that] defendants needed to persuade this Court that their actions went above self-dealing[,]" it ultimately concluded that the 2005 Plan "was approved by the shareholders, and more than the individually named directors and officers benefited from the award allocations." It reasoned that "[t]hose awards[,] while appearing unreasonable to the plaintiff[,] have a basis in the [e]quity [i]ncentive [p]lans of peer group[ ] institutions and are not so far outside the norm as to require this Court to step in and modify them."

Focusing on the adoption and implementation of the 2005 Plan, the Chancery Court determined that the trial testimony "grounded the allocation[s under the 2005 Plan] in the alignment of interest principle." It concluded that the 2005 Plan "does establish a community of interest between the shareholders and the Board of Directors." It remarked that "[o]wnership would encourage the Board and its officers to see that the bank moves more steadily towards profitability." It ruled that "[p]laintiff has been unable to sustain that the directors and the officers have acted in any way intentionally to injure the bank and its shareholders[, and that p]laintiff has failed to establish that there has been 'conscious disregard for one's responsibilities . . . for determining whether fiduciaries have acted in good faith.'" (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 775 (Del.Ch. 2005)). Recognizing that "[p]lainitff may disagree with actions of the Board of Directors or the speed of its progress towards profitability for this institution[,]" it ultimately ruled that "plaintiff has failed to establish that this Board and these awards and compensations in any way deviate from the historic pattern of this institution." Conceding that the awards might be "on the fringe of some peer groups with regard to its compensation packages," it held that "the awards by the [c]ompensation [c]ommittee are consistent with similar institutions." Granting the deference due under the business judgment rule and exercising proper restraint, it concluded: "This may not be the best action for the institution, but it is a sustainable position."

### The Reconsideration Motion

Seidman sought reconsideration. In respect of Seidman's attacks on the approval and implementation of the 2005 Plan, the Chancery Court reiterated that "[p]laintiff failed to persuade this Court that *no* person of sound business judgment would have found that the benefits conferred were completely unreasonable based on the services performed by the directors." (emphasis in original). Again referring to the expert proofs tendered by defendants, it repeated that, "during conversion, the most important goal is to align [the interests of d]irectors and officers with those of its current shareholder[s] and that the award of option and stocks put those directors and officers in the same position as the shareholders." Referencing again the expert testimony tendered by defendants and admitted at the trial, it noted that " 'you want the bank to perform because you want the value of the shares to increase and provide investment opportunities.' " It therefore "did not find that the [2005 Plan] constituted 'waste.' " [10]

### The Appeal and Reconsideration

Plaintiff appealed and, in an unpublished, per curiam opinion, the Appellate Division affirmed the Chancery Court's rulings in respect of the 2005 Plan. After first acknowledging the limited scope of appellate review of non-jury trial judgments, the panel turned to the substance of Seidman's claims. It rejected Seidman's "arguments attacking the merits of defendants' actions." It started its analysis by noting that "New Jersey courts presume that a board of directors' decisions are proper and in the best interest of the corporation, unless the challenging shareholder(s) can show a breach of the board's fiduciary duties of care, loyalty, or good faith." (citations omitted). It explained:

---

[10] Defendants also cross-moved, arguing that the Chancery Court had overlooked testimony, and that such shortcoming led the court to conclude in error that the testimony concerning the consultant compensation paid to one of the directors was less than candid. We need not address that point as it too was not preserved before us.

Under the business judgment rule, there is a rebuttable presumption that good faith decisions based on reasonable business knowledge by a board of directors are not actionable by those who have an interest in the business entity. The rule protects a board of directors from being questioned or second-guessed on conduct of corporate affairs, except in instances of fraud, self-dealing, or unconscionable conduct; it exists to promote and protect the full and free exercise of the power of management given to the directors. Stated differently, bad judgment, without bad faith, does not ordinarily make officers individually liable.

The rule places the initial burden on the person challenging a corporate decision to demonstrate self-dealing on the part of the decision-maker(s), or any other disabling factor. If the challenger sustains that initial burden, then the presumption of the rule is rebutted, and the burden of proof shifts to the defendant or defendants to show that the transaction was, in fact, fair to the corporation.

[ (citations, internal quotation marks and editing marks omitted).]

Focusing on Seidman's challenge to the stock option grants and restricted stock awards made under the 2005 Plan, the panel agreed with the Chancery Court's analysis and conclusions. Quoting *Gottlieb v. Heyden Chem. Corp.*, 91 A.2d 57, 58 (Del.1952), it observed:

[W]here board members vote themselves stock options and do not obtain stockholder ratification, they are deemed to be interested in the transaction and are not entitled to the presumption of the business judgment rule; they themselves have assumed the burden of clearly proving their utmost good faith and the most scrupulous inherent fairness of the bargain. Where there is stockholder ratification, however, the burden of proof is shifted to the objector.

[ (internal quotation marks omitted).]

It noted further that, when the challenged acts have been ratified by the stockholders, "the court will look into the transaction only far enough to see whether the terms are so unequal as to amount to waste, or whether, on the other hand, the question is such a close one as to call for the exercise of what is commonly called business judgment." (citation and internal quotation marks omitted). It stated the rule clearly: "it is axiomatic in such cases that the courts will not substitute their own business judgment for that exercised in good faith by the stockholders." (citation, internal quotation marks and editing marks omitted). Applying those standards, the panel reasoned that

because the directors awarded themselves stock and stock options, they were clearly "interested" in the transaction[, but b]ecause the awards were made pursuant to a shareholder approved plan, however, the burden shifted to the

plaintiffs. [Seidman] failed to meet this burden. There is no evidence showing self-dealing on the part [of] the directors, or any "other disabling factor," necessary to rebut the business judgment rule. [Seidman] failed to demonstrate that the directors breached their duty of care, or were otherwise unconscionable.
[ (citations and internal quotation marks omitted).]

The panel also rejected Seidman's parallel claim of corporate waste in respect of allocations made under the 2005 Plan. It noted that "[c]orporate waste is an 'extreme test, very rarely satisfied by a shareholder plaintiff.'" (quoting *Zupnick v. Goizueta*, 698 *A*.2d 384, 387 (Del.Ch.1997)). Relying on the same passage from *Lewis, supra*, 699 *A*.2d at 336, on which the Chancery Court also relied, it observed that "'[d]irectors are guilty of corporate waste, only when they authorize an exchange that is so one-sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'" (quoting *Glazer v. Zapata Corp.*, 658 *A*.2d 176, 183 (Del.Ch.1993)). It remarked that "'a board's decision on executive compensation is entitled to great deference'" and that "'[i]t is the essence of business judgment for a board to determine if a particular individual warrant[s] large amounts of money, whether in the form of current salary or severance provisions.'" (quoting *Brehm, supra*, 746 *A*.2d at 263). It concluded that "the record shows that the directors' actions were not tainted by self-interest, and the plan was properly ratified by the shareholders." Akin to the Chancery Court's determination, it concluded that "plaintiffs have failed to meet the burden of showing 'that no person of ordinary business judgment could be expected to entertain the view that the consideration furnished was a fair exchange for the options conferred.'" (quoting *Eliasberg, supra*, 23 *N.J.Super.* at 449, 92 *A*.2d 862).

Dissatisfied, Seidman moved for reconsideration of the Appellate Division's judgment; that motion was denied.

Seidman sought certification "only with respect to plaintiffs' claim for relief based on the approval by the interested [d]irectors of allegedly excessive awards of shares of stock and stock options for themselves under [t]he 2005 Plan." That petition was granted, *Seidman v. Clifton Sav. Bank, S.L.A.*, 203 *N.J.* 92, 999 *A*.2d 461

(2010), and the parties were granted leave to file supplemental briefs.

## II.

Seidman claims that, in order to trigger the application of the business judgment rule, the stockholder must be fully informed beforehand, as an indispensable prerequisite to a valid stockholder approval or ratification. He claims that neither the summary plan description of the 2005 Plan contained in the proxy statement nor the text of the 2005 Plan itself that was appended to the proxy statement disclosed that the compensation committee intended to issue to the directors the full amount of stock option grants and restricted stock awards allowable under the applicable federal regulations. He asserts that such lack of disclosure vitiates the approval granted by the stockholders at the 2005 annual meeting and that, as a result, the directors are not entitled to the protections of the business judgment rule. In that event, he claims, the directors of Bancorp are liable for disgorgement of those grants and awards.

Defendants conversely argue that the proxy statement disclosures, including the attachment of the full text of the 2005 Plan, sufficed to permit the stockholders to make an informed decision in respect of approving the 2005 Plan and, once approved, the compensation committee was authorized to issue stock option grants and restricted stock awards as envisioned by the 2005 Plan subject, of course, to the limits imposed by federal law.

The controversy presented in this appeal, then, is whether, as a condition precedent to the invocation of the business judgment rule, the disclosures made in the proxy statement and the 2005 Plan were sufficient to inform the stockholders that the maximum stock option grants and restricted stock awards allowable to the directors in fact would be made. It is to the resolution of that question that we now shift our focus.

### III.

### A.

 Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: " 'we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]' " *In re Trust Created By Agreement Dated December 20, 1961, ex rel. Johnson*, 194 *N.J.* 276, 284, 944 *A.*2d 588 (2008) (quoting *Rova Farms, supra*, 65 *N.J.* at 484, 323 *A.*2d 495 (internal quotation and editing marks omitted)). In that context, we also have emphasized that " 'the appellate court therefore ponders whether, on the contrary, there is substantial evidence in support of the trial judge's findings and conclusions.' " *Ibid.* (quoting *Rova Farms, supra*, 65 *N.J.* at 484, 323 *A.*2d 495 (citation omitted)). The operative rule is clear:

> The scope of appellate review of a trial court's fact-finding function is limited. The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence. Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility. Because a trial court hears the case, sees and observes the witnesses, and hears them testify, it has a better perspective than a reviewing court in evaluating the veracity of witnesses. Therefore, an appellate court should not disturb the factual findings and legal conclusions of the trial judge unless it is convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice. The appellate court should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter.
>
> [*Cesare v. Cesare*, 154 *N.J.* 394, 411–12, 713 *A.*2d 390 (1998) (citations, internal quotation marks and editing marks omitted).]

Informed by the relevant standard of review, we turn to the substantive principles governing this appeal.

### B.

Seidman claims that, in order to invoke the business judgment rule based on stockholder ratification, it must be shown that the

stockholders' approval of the 2005 Plan was based on complete disclosure. He argues that it was a foregone conclusion that the compensation committee was going to issue the maximum amount of stock option grants and restricted stock awards to the seven members of Bancorp's board of directors, and that the failure to make that disclosure vitiated any stockholder approval received. In order to properly gauge Seidman's claims, we must return to and re-examine the contours of the business judgment rule.

Although now over a half-century old, *Eliasberg, supra,* remains a vital, vibrant and thorough exposition of New Jersey's business judgment rule. By way of backdrop, in the context of a challenge to an incentive stock option plan adopted by the stockholders of the Standard Oil Company and under which the directors awarded themselves stock options, the plaintiff had

> attack[ed] the legality of the plan[, claiming, among other things,] that the directors being among the beneficiaries of their proposal, each had a direct, personal and valuable interest in the stock incentive plan; that in their dealings with the stockholders the burden was upon them to prove full and fair disclosure of every material fact which might possibly lead the stockholders to withhold consent, and that they were guilty of fraudulent conduct because of misleading representations and failure to make full and complete disclosure as to the true purpose of the plan and its effect upon the corporation.
>
> [*Eliasberg, supra,* 23 *N.J.Super.* at 438–39, 92 *A.2d* 862.]

Accepting the overall validity of a stock option plan, *id.* at 440, 92 *A.*2d 862, the *Eliasberg* court noted that the propriety of a stock option plan may be a function of who its beneficiaries are. It explained that "[a] plan may be valid insofar as it concerns optionees other than the directors and invalid with respect to interested directors." *Ibid.* It highlighted that "[t]he burden of the proof required in a proceeding wherein the validity of a plan or the execution of it is involved varies in each case and depends upon whether or not the plan had stockholder approval." *Ibid.* It observed that, "[i]nsofar as beneficiaries other than interested directors are concerned, the burden of proving illegality or invalidity would be upon the challenger." *Ibid.*

The distinction drawn between directors and all others as beneficiaries of a corporation's incentive plan is firmly based in

reason and experience. It is because "[t]he directors of a corporation are, of course, fiduciaries, and in their dealings with the corporation and the stockholders the utmost fidelity is demanded." *Id.* at 441, 92 *A.*2d 862 (citing *Whitfield v. Kern,* 122 *N.J.Eq.* 332, 192 *A.* 48 (E. & A.1937)). The *Eliasberg* court explained that "[t]he personal interest of directors does not render a transaction void *per se,* but voidable at the option of the stockholders. Full and fair disclosure of all material facts must be made by the directors; mere notice is not enough." *Ibid.* (citing *Rogers v. Guar. Trust Co.,* 288 *U.S.* 123, 53 *S.Ct.* 295, 77 *L.Ed.* 652 (1933); *Gen. Inv. Co. v. Am. Hide & Leather Co.,* 97 *N.J.Eq.* 230, 127 *A.* 659 (Ch.1925), *aff'd,* 98 *N.J.Eq.* 326, 129 *A.* 244 (E. & A.1925)).

In those instances "[w]here there is no stockholders' approval of a contract or proposal in which a director has a personal interest," *Eliasberg* notes that "the burden is upon the director to completely justify the transaction." *Ibid.* However, "[w]hen stockholders have notice of the director's interest and authorize the directors to enter into a contract, the agreement will be unassailable in the absence of actual fraud or want of power in the corporation." *Ibid.* (citations omitted). Properly relying on precedent from the Supreme Court of Delaware, *see Balsamides v. Protameen Chems., Inc.,* 160 *N.J.* 352, 372, 734 *A.*2d 721 (1999) ("In analyzing corporate law issues, we find Delaware law to be helpful."); *Lawson Mardon Wheaton v. Smith,* 160 *N.J.* 383, 398, 734 *A.*2d 738 (1999) (same), the *Eliasberg* court ruled that " '[w]here there is stockholder ratification, however, the burden of proof is shifted to the objector.' " *Id.* at 442, 92 *A.*2d 862 (quoting *Gottlieb, supra,* 91 *A.*2d at 58). It noted that, in the latter case, " 'the objecting stockholder must convince the court that no person of ordinarily sound business judgment would be expected to entertain the view that the consideration furnished by the individual directors is a fair exchange for the options conferred.' " *Ibid.* (quoting *Gottlieb, supra,* 91 *A.*2d at 58). It summarized the relevant rule thusly:

"Where the directors have represented both themselves and the corporation, and where there was no ratification by stockholders, and the action is thereupon duly challenged, the court will usually have no choice but to employ its own judgment in

deciding the perhaps very close and troublesome questions as to whether the evidence shows that the directors in fact used the utmost good faith and the most scrupulous fairness. Where there was stockholder ratification, however, the court will look into the transaction only far enough to see whether the terms are so unequal as to amount to waste, or whether, on the other hand, the question is such a close one as to call for the exercise of what is commonly called 'business judgment.' In the former case the court will reverse the decision of the stockholders; in the latter it will not."

[*Ibid.* (quoting *Gottlieb, supra,* 91 A.2d at 58).]

Applying those principles, the *Eliasberg* court explained that "the company, prior to the meeting, submitted to the stockholders the complete text of the plan and a proxy statement which specified that the stock options were to be of the type provided for under section 130A of the Internal Revenue Code." *Id.* at 443, 92 A.2d 862 (emphasis omitted). The plaintiff, however, argued that "it is the duty of a director who submits to the stockholder a full text of a proposal to accompany it with an analysis of the beneficial and detrimental aspects of the proposal." *Ibid.* Acknowledging the salutary effect the plaintiff's proposal might have, the court stated that it "kn[e]w of no legal authority, nor does the plaintiff submit any, which imposes upon a director the duty to explain or interpret the tax effects of a proposal the full terms of which are submitted to the stockholder." *Id.* at 444, 92 A.2d 862. The court pronounced that it is "the obligation of the stockholder who receives the complete text of a proposal which may be involved or technical, to make inquiry—either from independent sources or from the corporation or the directors." *Ibid.* It highlighted that, "[i]n the latter instance, it would be the duty of the company or the directors to inform or advise the stockholder[,]" and underscored that "[a] stockholder is chargeable with knowledge he could have acquired." *Ibid.*

The *Eliasberg* court ruled that, even in the absence of the additional disclosures sought by the plaintiff, "[t]he notice and proxy statement to the stockholders presented the plan in full" and concluded that "these are sufficiently detailed to inform them of the proposal to issue options to directors and other executives for continuing in the employ of the company without requiring

them to perform any additional duties or to assume new responsibilities." *Id.* at 446, 92 *A.*2d 862. It underscored that "no stockholder who voted for the plan has testified that he was misled, and the evidence presented does not warrant the inference that any stockholder was misled and would have voted in opposition to the plan if notice to the stockholders had been drafted as the plaintiff suggests it should have been." *Ibid.* In doing so, it acknowledged that, although the fact that the proxy statement was submitted to the SEC could not be used to "impl[y] accuracy and truthfulness of the statements in a proxy," *see supra* at 157 n. 4, 14 *A.*3d at 40 n. 4, "the fact of the submission of the proxy to the Commission is not to be ignored. It is a fact to be considered in conjunction with all other facts in the case and without according to the examination by the Commission any element of approval." *Id.* at 444–45, 92 *A.*2d 862. *See also Brundage v. N.J. Zinc Co.,* 48 *N.J.* 450, 474, 226 *A.*2d 585 (1967).

Having determined that the defendants in *Eliasberg* were entitled to the protection of the business judgment rule, the court then turned to whether the stock option grants and restricted stock awards under the challenged plan constituted "waste." *Id.* at 449, 92 *A.*2d 862. In this respect, the definition of corporate waste set forth in *Lewis, supra,* 699 *A.*2d at 336, aptly sets forth the doctrine of corporate waste in New Jersey; according to *Lewis,* "a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." Although the *Eliasberg* court did not apply that specific definition of corporate waste, it found that "[t]he plaintiff has not offered any proof whatsoever upon or from which the court can make any determination of the value of the services of the company's executives or that the compensation to be paid them, including any profit that might be realized from the exercise of the options, is disproportionate to the value of the services." *Eliasberg, supra,* 23 *N.J.Super.* at 449–50, 92 *A.*2d 862. It further noted that "[t]here was no evidence of the compensation paid to executives of competitors or other corporations as large as or comparatively as large as the

defendant, so that the court could have a basis for evaluation." *Id.* at 450, 92 *A.*2d 862. It therefore concluded that "there is no evidence before me which would warrant the substitution of my estimate of the value of the services for the judgment of the directors, approved by the overwhelming majority of the stockholders." *Ibid.* (citations omitted). In the main, it determined that "the stockholders were furnished with the full terms of the proposed plan; that they were advised of the interest of the directors in the proposal, even though the names were omitted; and also of the terms upon which the options were to be issued and exercised[,]" and that, "[t]herefore, in view of the stockholders' approval and ratification, it was the duty of the plaintiff to prove unfairness of the basic transaction, and he failed to sustain this burden." *Id.* at 450–51, 92 *A.*2d 862.

*Eliasberg* was affirmed on the opinion below by this Court, 12 *N.J.* 467, 97 *A.*2d 437 (1953), and has been cited with approval several times, *see, e.g., Brundage, supra,* 48 *N.J.* at 474, 226 *A.*2d 585 (describing weight to be given SEC approvals); *Bilotti v. Accurate Forming Corp.,* 39 *N.J.* 184, 189, 188 *A.*2d 24 (1963) (recognizing cause of action to invalidate stock option plan and enjoin issuance of options); *Abeles v. Adams Eng'g Co.,* 35 *N.J.* 411, 428, 173 *A.*2d 246 (1961) (stating that "a contract between a corporation and one of its directors, made without approval of the stockholders, is not enforceable by the director unless it is honest, fair and reasonable" and that "[t]he burden of demonstrating those elements by clear and convincing proof is on the director"); *Hill Dredging Corp. v. Risley,* 18 *N.J.* 501, 531, 114 *A.*2d 697 (1955) (stating that "[w]hile a director of a corporation is not absolutely precluded from dealing with or entering into a contract with his own corporation, nor is such transaction void *per se* ").

That said, since *Eliasberg,* we have not had the opportunity to apply the business judgment rule in the context of the challenged sufficiency of a proxy statement. *See, e.g., Comm. for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n,* 192 *N.J.* 344, 369, 929 *A.*2d 1060 (2007) (applying business judgment rule to

protect common interest community residents from arbitrary decision-making); *In re PSE & G S'holder Litig.*, 173 *N.J.* 258, 267, 801 *A.2d* 295 (2002) (applying modified business judgment rule in determining whether corporation's board of directors responded properly in rejecting shareholder's demand to commence legal action on corporation's behalf); *Green Party v. Hartz Mt. Indus.*, 164 *N.J.* 127, 148, 752 *A.2d* 315 (2000) (holding that business judgment rule cannot be used to determine reasonableness of time, place, and manner regulations of free speech); *In re Trust of Arens*, 41 *N.J.* 364, 375, 197 *A.2d* 1 (1964) (explaining that declaration of any kind of dividend is committed to business judgment of corporate directors); *Asbury Park Press, Inc. v. Asbury Park*, 23 *N.J.* 50, 55, 127 *A.2d* 401 (1956) (holding that courts will not infiltrate realm of business judgment which resides in municipal officials).

In defining whether the business judgment rule applies to insulate the actions of defendants' board of directors as challenged by plaintiffs, the concise definition of the rule set forth in *Green Party, supra*, 164 *N.J.* at 147–48, 752 *A.2d* 315 (citations omitted), bears repeating:

> The business judgment rule has its roots in corporate law as a means of shielding internal business decisions from second-guessing by the courts. Under the rule, when business judgments are made in good faith based on reasonable business knowledge, the decision makers are immune from liability from actions brought by others who have an interest in the business entity. The business judgment rule generally asks (1) whether the actions were authorized by statute or by charter, and if so, (2) whether the action is fraudulent, self-dealing or unconscionable.

The rationale that animates the expression of the business judgment rule in *Green Party* also is entirely congruent with that of the American Law Institute (ALI).[11] In Section 4.01 of its

---

[11] In other settings, we have relied on the ALI's work. *See, e.g., LoBiondo v. Schwartz*, 199 *N.J.* 62, 111, 970 *A.2d* 1007 (2009) (discussing, with approval, ALI's *Restatement (Third) of the Law Governing Lawyers* ); *P.V. ex rel. T.V. v. Camp Jaycee*, 197 *N.J.* 132, 142, 962 *A.2d* 453 (2008) (adhering to ALI's *Restatement (Second) of Conflict of Laws* ); *State v. Froland*, 193 *N.J.* 186, 198, 936 *A.2d* 947 (2007) (discussing adoption of approach of ALI's *Model Penal Code* ); *Mani v. Mani*, 183 *N.J.* 70, 90, 869 *A.2d* 904 (2005) (citing with approval

*Principles of Corporate Governance,* the ALI defines the relevant corporate governance duties and the effect of the business judgment rule as follows:

> (a) A director or officer has a duty to the corporation to perform the director's or officer's functions in good faith, in a manner that he or she reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like position and under similar circumstances. This Subsection (a) is subject to the provisions of Subsection (c) (the business judgment rule) where applicable.
>
> (1) The duty in Subsection (a) includes the obligation to make, or cause to be made, an inquiry when, but only when, the circumstances would alert a reasonable director or officer to the need therefor. The extent of such inquiry shall be such as the director or officer reasonably believes to be necessary.
>
> (2) In performing any of his or her functions (including oversight functions), a director or officer is entitled to rely on materials and persons in accordance with §§ 4.02 and 4.03 (reliance on directors, officers, employees, experts, other persons, and committees of the board).
>
> . . . .
>
> (c) A director or officer who makes a business judgment in good faith fulfills the duty under this Section if the director or officer:
>
> (1) is not interested [§ 1.23] in the subject of the business judgment;
>
> (2) is informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances; and
>
> (3) rationally believes that the business judgment is in the best interests of the corporation.
>
> (d) A person challenging the conduct of a director or officer under this Section has the burden of proving a breach of the duty of care, including the inapplicability of the provisions as to the fulfillment of duty under Subsection (b) or (c), and, in a damage action, the burden of proving that the breach was the legal cause of damage suffered by the corporation.
>
> [*Principles of Corporate Governance* § 4.01 (Am. Law Inst.2005).]

An amalgam of these various expressions of the business judgment rule leads us to reaffirm long-standing precedent, hew closely to the reasoning of *Eliasberg* and its progeny, and reiter-

---

ALI's *Principles of the Law of Family Dissolution: Analysis and Recommendations* ); Lynch v. Scheininger, 162 *N.J.* 209, 237–38, 744 *A.2d* 113 (2000) (discussing ALI's *Restatement (Third) of Torts* ); Fu v. Fu, 160 *N.J.* 108, 733 *A.2d* 1133 (1999) (recognizing similarly between New Jersey's governmental-interest test and most-significant-relationship test set forth in ALI's *Restatement (Second) of Conflict of Laws* ).

ate that when corporate actions either have been approved or ratified by the stockholders, the propriety of those actions is to be gauged by the business judgment rule. And, if the business judgment rule applies, stockholder-approved or—ratified corporate actions are to be presumed correct; that presumption may be rebutted only if the challenged corporate actions are so far from the norm of responsible corporate behavior as to be unconscionable or constitute a fraud, impermissible self-dealing or corporate waste.

It is against this yardstick that we measure Seidman's claims, respectively as to the application of the business judgment rule and the claims of corporate waste.

## C.

Relying on *Gottlieb, supra,* and *Gantler v. Stephens,* 965 A.2d 695 (Del.2009), Seidman asserts that defendants are not entitled to the benefit of the business judgment rule because the stockholder approval of the 2005 Plan was infirm; the infirmity he assigns to the 2005 Plan is that it did not specifically describe that the compensation committee would issue to the directors the full measure of stock option grants and restricted stock awards allowable under the relevant federal regulations. We cannot agree.

As both the Chancery Court and the Appellate Division concluded, the disclosures made in the proxy statement and in the 2005 Plan itself sufficiently placed stockholders on notice that there were regulatory limits applicable as to who was eligible to receive stock under the 2005 Plan and in what amounts: the proxy statement and the 2005 Plan explained in detail how the 2005 Plan was to be adopted; how, once adopted, it was to operate; who would be responsible for its operation; who was eligible to receive stock under it; the total amount of stock available to be distributed either as stock option grants or restricted stock awards; and— by reference to the applicable federal regulations—the upper limits on grants and awards to directors and employees.

Furthermore, an application of the factors deemed relevant in *Eliasberg* reinforces the conclusion that Seidman's claims cannot overcome the business judgment rule. Like in *Eliasberg, supra,* "[t]he notice and proxy statement to the stockholders presented the plan in full" and were "sufficiently detailed to inform them of the proposal to issue options to directors and other executives for continuing in the employ of the company without requiring them to perform any additional duties or to assume new responsibilities." 23 *N.J.Super.* at 446, 92 *A.*2d 862. Also as in *Eliasberg,* no stockholder who voted for the 2005 Plan "testified that he was misled, and the evidence presented does not warrant the inference that any stockholder was misled and would have voted in opposition to the plan if notice to the stockholders had been drafted as the plaintiff suggests it should have been." *Ibid.* Again as in *Eliasberg,* although the fact that the proxy statement was submitted to the SEC could not be used to "impl[y] accuracy and truthfulness of the statements in a proxy," nonetheless "the fact of the submission of the proxy to the Commission is not to be ignored. It is a fact to be considered in conjunction with all other facts in the case and without according to the examination by the Commission any element of approval." *Id.* at 444–45, 92 *A.*2d 862. In the aggregate of those circumstances, and applying *Eliasberg's* reasoning, which we reaffirm today, our ruling is inescapable: there is more than sufficient credible evidence in the record to support the Chancery Court's conclusion that plaintiff had failed to satisfy his burden to overcome the effect of the business judgment rule.

To the extent Seidman relies on *Gottlieb* and *Gantler* to support the claims advanced, that reliance is misplaced. In *Gottlieb, supra,* the Supreme Court of Delaware restated the operative rule as "where the board members vote themselves stock options and do not obtain stockholder ratification, they themselves have assumed the burden of clearly proving their utmost good faith and the most scrupulous inherent fairness of the bargain[,]" but that "[w]here there is stockholder ratification, however, the burden of proof is shifted to the objector." 91 *A.*2d at 58 (citations and

footnote omitted). It further noted that "[i]n such a case the objecting stockholder must convince the court that no person of ordinarily sound business judgment would be expected to entertain the view that the consideration furnished by the individual directors is a fair exchange for the options conferred." *Ibid.* *Gottlieb's* rule differs in no meaningful respect from the rule in *Eliasberg* we have just reaffirmed; indeed, *Eliasberg* quotes *Gottlieb* approvingly and at length. *Eliasberg, supra,* 23 *N.J.Super.* at 442, 449, 92 *A.*2d 862. Moreover, the stock awards here were not issued until *after* the stockholders approved the 2005 Plan. Therefore, the result reached here is entirely consistent with *Gottlieb.*

Likewise, *Gantler* offers no support for Seidman's claims. As a preliminary matter, *Gantler, supra,* addressed a pleading issue—whether the plaintiffs' complaint pled sufficient facts to overcome the business judgment presumption and, thus, survive a motion to dismiss, 965 *A.*2d at 698—and not a plenary appeal of a judgment after trial. At the outset, *Gantler* defined the scope of review it was bound to apply, *id.* at 703, and, explained that, under Delaware law, the business judgment rule creates " 'a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.' " *Id.* at 705–06 (quoting *Aronson v. Lewis,* 473 *A.*2d 805, 812 (Del.1984)). In that discrete pleading context, the Court determined that, "[p]rocedurally, the plaintiffs have the burden to plead facts sufficient to rebut that presumption." *Id.* at 706 (citation and footnote omitted). It further explained that, "[o]n a motion to dismiss, the pled facts must support a reasonable inference that in making the challenged decision, the board of directors breached either its duty of loyalty or its duty of care." *Ibid.* (citation and footnote omitted). It concluded that, "[i]f the plaintiff fails to satisfy that burden, a court will not substitute its judgment for that of the board if the decision can be attributed to any rational business purpose." *Ibid.* (citation, internal quotation marks, editing marks and footnote omitted).

■ At its core, *Gantler* is a sufficiency of pleading case, while this appeal arises from a non-jury trial tried to conclusion and a judgment on the merits entered, to which we are required to extend great deference. *In re Johnson Trust, supra,* 194 *N.J.* at 284, 944 *A.*2d 588. Thus, Seidman here is not entitled to the inferences the rules governing the sufficiency of pleadings allow to non-movants; on the contrary, defendants, as the successful verdict holders, are the ones who are entitled to have the facts viewed in the light most favorable to them and also are entitled to the benefit of all legitimate inferences therefrom. *Compare Lanzet v. Greenberg,* 126 *N.J.* 168, 172, 174, 594 *A.*2d 1309 (1991) (defining, in respect of motions for judgment notwithstanding the verdict, that verdict holder is entitled to have facts viewed in the light most favorable to it and verdict holder is entitled to benefit of all reasonable inferences therefrom), *with Cinque v. Crown Oil Corp.,* 135 *N.J.L.* 38, 40, 48 *A.*2d 777 (E. & A.1946) (providing that, on motion for directed verdict, "all of the evidence adduced by the plaintiff, and every legitimate inference which may be drawn therefrom, must be considered in the light most favorable to the plaintiff's claim, and if such evidence or inference of fact will support a verdict for plaintiff, such motion should be denied"). For those procedural reasons, *Gantler* is inapposite.

■ We add the following. To the extent, in the context of the application of the business judgment rule, *Gantler, supra,* may be read to differentiate between those instances where stockholder approval or ratification is required and those where stockholder approval or ratification is voluntary, 965 *A.*2d at 712–13, we decline to follow it. We perceive no meaningful difference in the quality, value or effect of stockholder approvals or ratifications based solely on the vagary of whether the approval or ratification was required or voluntary. When measured against the democratic principles inherent in and underlying the notion of the stockholder franchise, there can be no substantive difference in corporate governance effect between those matters that must be approved or ratified by the stockholders and those that, although

not required, nevertheless are submitted for stockholder approval or ratification. On the contrary, granting equal dignity to required and voluntary stockholder approvals or ratifications fosters additional stockholder participation in corporate life, a result that should be encouraged.

### D.

Even if protected by the business judgment rule, defendants could still be liable as a result of the implementation of the 2005 Plan based on a theory of corporate waste. According to Seidman, there was no reason to "reward" Bancorp's directors with stock option grants and restricted stock awards because doing so did not satisfy the first of the stated purposes of the 2005 Plan, that is, to attract new blood and to retain existing personnel. Admittedly, all members of Bancorp's board of directors were long-term employees of the Bank who already were well compensated. Thus, Seidman's corporate waste claims seem to have superficial appeal.

However, citing the "alignment of interests" doctrine advanced by defendants' expert, the Chancery Court concluded that the other purposes of the 2005 Plan—to provide officers, employees and non-employee directors of Bancorp and the Bank with a proprietary interest in their employer as an incentive to contribute to Bancorp's success; to promote the attention of management to other stockholder concerns; and to reward employees for outstanding performance—were satisfied by the stock option grants and restricted stock awards given by the compensation committee to the members of the board of directors.

Neither the Appellate Division nor we quarrel with that conclusion, to which, again, significant deference is due. In the totality of circumstances presented, we are not convinced that the Chancery Court's factual findings and legal conclusions "are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]" *In re Johnson Trust, supra,* 194 *N.J.* at 284,

944 *A.*2d 588 (citation and internal quotation marks omitted). Conversely, based on a careful review of the Chancery Court's comprehensive letter opinions rendering its decision at the conclusion of a hotly contested trial and denying Seidman's motion for reconsideration, we must conclude that "there is substantial evidence in support of the trial judge's findings and conclusions." *Rova Farms, supra,* 65 *N.J.* at 484, 323 *A.*2d 495 (citation omitted). Therefore, on the record presented, Seidman has failed to demonstrate that the stock option grants and restricted stock awards given to the directors under the 2005 Plan "entail[ ] an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Lewis, supra,* 699 *A.*2d at 336. In short, Seidman failed to prove that the challenged stock option grants and restricted stock awards constituted corporate waste.

## IV.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO and HOENS, and Judge STERN (temporarily assigned)—7.

*Opposed*—None.