**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3981-18T3

JUPITER ENVIRONMENTAL
SERVICES, INC.,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

WALLACE BROS., INC., and
LIBERTY MUTUAL
INSURANCE COMPANY,

      Defendants-Appellants/
      Cross-Respondents.

_____

      Argued telephonically March 18, 2020 –
      Decided April 9, 2020

      Before Judges Fuentes, Haas and Enright.

      On appeal from the Superior Court of New Jersey, Law
      Division, Ocean County, Docket No. L-0413-17.

      Patrick Thomas Murray, III, argued the cause for
      appellants/cross-respondents (Peckar & Abramson, PC,
      attorneys; Patrick Thomas Murray, III, on the briefs).

Matthew David Lakind argued the cause for respondent/cross-appellant (Tesser & Cohen, attorneys; Matthew David Lakind, on the briefs).

PER CURIAM

In this breach of contract case involving the installation of windows at eight public schools, defendants Wallace Bros., Inc. (Wallace) and its insurer Liberty Mutual Insurance Company appeal from the Law Division's April 2, 2019 order entering judgment in favor of plaintiff Jupiter Environmental Services, Inc. (Jupiter). Wallace contends that the court erred by finding that it breached its contract with Jupiter, and requiring Wallace to pay Jupiter its lost profits and overhead, plus interest, on two school projects for which Jupiter performed no work after Wallace deleted these schools from the contract pursuant to one of its provisions. Wallace also argues that the court erred by imposing interest upon a different portion of the judgment under the Prompt Payment Act (PPA), N.J.S.A. 2A:30A-1 to -2.

Jupiter has filed a cross-appeal from the same judgment, and argues that the court should have awarded it additional damages for a third school that was deleted from the contract, together with attorney's fees under the PPA. Jupiter also asserts that the court miscalculated the amount of lost profits and overhead

A-3981-18T3

due it, as well as the amount Wallace owed Jupiter for the completion of a fourth project.

Having reviewed the parties' contentions in light of the record and applicable law, we affirm the judgment in part, reverse it in part, and remand for the entry of a new judgment.

I.

The parties are fully familiar with the lengthy procedural history and facts of this matter. Therefore, we need only recite the most salient facts here.[1]

Wallace was the general contractor on a construction project to renovate eight public schools for the Brick Township Board of Education (Brick). As part of its duties as the general contractor, Wallace was responsible for removing and replacing windows at each of the schools. Brick and Wallace believed there was asbestos in all of the windows and, therefore, Wallace was required to safely remove this hazardous material from the schools.

Because Wallace was not qualified to remove asbestos, it subcontracted with Jupiter, an environmental/asbestos removal contractor, to perform the

---

[1] These facts were developed at a three-day bench trial. The only witnesses at the trial were Jupiter's vice-president, Pane Repic, and Wallace's president, Steven Wallace. To avoid confusion between Wallace, the company, and its president, we hereafter refer to Mr. Wallace as Steven. In doing so, we intend no disrespect.

asbestos abatement aspect of the project. The parties agreed that after Wallace and its other subcontractors took out the windows, Jupiter would take them from the schools, and later remove the asbestos at its shop.

Jupiter's bid on the subcontract was broken out with separate prices for each of the schools. There were eight sets of plans, eight sets of drawings, eight scheduled start and completion dates, and eight abatement management plans. After some preliminary negotiations, Wallace accepted Jupiter's offer to complete all the asbestos removal work for $425,000. During the negotiations, the parties learned that the windows in two of the schools, Lake Riviera Middle School (Lake Riviera) and Midstream Elementary School (Midstream), might not contain any asbestos. Thus, they agreed that if asbestos was found and needed to be abated, Jupiter would be entitled to an additional $35,000 for this work.

Of particular importance to the issues involved in these appeals, Section 5.2 of the subcontract allowed Wallace to reduce or add to Jupiter's scope of work in any manner and for any reason. Section 5.2 stated:

> The Subcontractor may be ordered in writing by the Contractor, without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions, including those required by Modifications to the Prime Contract issued subsequent

4

to the execution of this Agreement, the Subcontract Sum and the Subcontract Time being adjusted accordingly. The Subcontractor, prior to the commencement of such changed or revised Work, shall submit promptly to the Contractor written copies of a claim for adjustment to the Subcontract Sum and Subcontract Time for such revised Work in a manner consistent with requirements of the Subcontract Documents.

[(emphasis added).]

Work on the project began in October 2015. A scheduling problem soon developed at the Osbornville Elementary School[2] (Osbornville). Brick wanted the work to be completed during the winter break so as not to interfere with the kindergarten to grade four students who attended the school. Jupiter notified Wallace that it could not meet this schedule.

Accordingly, Wallace invoked Section 5.2 of the subcontract and deleted Osbornville from the project. Wallace then made arrangements with Brick's design professionals permitting it to encapsulate the asbestos, rather than remove it, and Wallace was able to complete the Osbornville project on its own.

---

[2] In their respective briefs, the parties provide different spellings of the name of this school. Wallace refers to it as the "Osborneville Elementary School," while Jupiter states it is the "Osberneville Elementary School." We refer to this institution by the name listed on Brick's website, which is the "Osbornville Elementary School." http://www.brickschools.org/Schools/Osbornville-ES (last visited Mar. 22, 2020).

A-3981-18T3

In February 2016, testing reports at Lake Riviera and Midstream confirmed there was no asbestos in the windows at either school. Because Wallace no longer needed an asbestos removal expert like Jupiter to remove the windows and asbestos at these schools, it removed them from the subcontract pursuant to Section 5.2.

Jupiter completed the asbestos removal work needed at the five remaining schools. At the end of the project, Wallace calculated that it owed Jupiter $54,184.50 for its work at the Lanes Mill Elementary School (Lanes Mill). However, Jupiter demanded that Wallace pay it approximately $190,000, which included payment for the Osbornville, Lake Riviera, and Midstream schools that had been deleted from the subcontract. Because the parties remained at loggerheads, they participated in mediation to attempt to resolve the dispute, but they were not successful. Jupiter subsequently commenced this breach of contract action.

Following the trial, the judge concluded that Wallace did not owe Jupiter anything on the Osbornville project because Wallace deleted this school from the subcontract pursuant to Section 5.2 and Jupiter performed no work on it. In so ruling, however, the judge determined that contrary to the clear language of Section 5.2 that permitted the contractor to modify the subcontract for any

reason whatsoever, Wallace could only properly delete a school from the subcontract if the deletion was caused by "unforeseen circumstances," or if the owner of the project, in this case Brick, ordered the deletion.

The judge's conclusion that Section 5.2 was subject to conditions that nowhere appear in the subcontract was based upon a misreading of Steven's trial testimony. On direct examination, Steven was asked to explain his "understanding" of Section 5.2. Steven replied:

> It is very common in our business that work is added and deleted in the contract after you start. It could be because of unforeseen conditions, and you need a change order to fix it. It could be that simply the owner adds work to the contract or simply the owner removes work from the contract. I mean, we're doing a job right now where the owner just took $300,000 worth of work out of the contract and you know it happens.
>
> In this job, for instance, this is, you know at . . . the last two jobs, which was Midstream[] and Lake Riviera, . . . we always knew it was going to be a discussion because it was clean demolition, and [Wallace was] doing the clean demolition. Jupiter was not doing the clean demolition on the job. But at that point[,] and given the discussion and given other factors that factored in, which was scheduling, it was . . . beneficial to the project to just do the clean demolition with the men that were doing the clean demolition and not bring another contractor in.
>
> [(emphasis added).]

A-3981-18T3

As Steven later reiterated, he was only providing illustrative examples, rather than an exhaustive list, of the circumstances where Section 5.2, which by its terms was not subject to any conditions, might be invoked by the contractor.

Here, the judge found that because it was not anticipated by the parties that Jupiter would be unable to complete work on the Osbornville school in a timely manner, Wallace was permitted to invoke Section 5.2 and remove this school from the subcontract. Therefore, the judge concluded that Wallace was not required to pay Jupiter anything in connection with this part of the project.

However, the judge also relied upon his misunderstanding of Steven's testimony to next rule that unlike what happened with Osbornville, Wallace did not have a "good reason" to delete the Lake Riviera and Midstream schools from the subcontract. As noted above, Wallace removed these two schools after it was confirmed there was no asbestos for Jupiter to remove at either school. However, because the parties contemplated that this might happen, the judge found that the absence of asbestos-removal work for which Jupiter's expertise was needed was not an "unforeseen" circumstance, and had not been ordered by Brick. Accordingly, the judge ruled that Wallace had to reimburse Jupiter for its lost profits and overhead on these two projects even though nothing in the

subcontract required this and Jupiter had not performed any work at these schools.

The judge then determined the amount of lost profits and overhead he believed was due to Jupiter for Lake Riviera and Midstream. In doing so, he remarked that "neither party provided any real assistance to the [c]ourt to assess the measure of damages." By thereafter employing a series of calculations that were not well explained, the judge found that Wallace should pay Jupiter $19,749 in lost profits and overhead, together with $19,800 for "General Conditions and Insurance," $11,872.50 for "Retainage on Completed Work," and $2819.05 in pre-judgment interest under Rule 4:42-11. The sum of these awards is $54,240.55.

The judge also ordered Wallace to pay Jupiter an additional $54,184.50, representing the money due for the Lanes Mill school. The judge rejected Jupiter's request for its attorney's fees and costs under the PPA in connection with pursuing this payment, and found that the PPA did not apply because "the trial was really about the deletion of Midstream[] and Lake Riviera and Osbornville and not about that issue." However, the judge then inconsistently ordered Wallace to pay Jupiter $8794.82 in interest under the PPA. These appeals followed.

9

II.

We begin by addressing the issues raised by the parties regarding Wallace's decision to delete three schools from the subcontract. In its appeal, Wallace asserts that the judge erred by concluding that Wallace breached the subcontract by deleting the Lake Riviera and Midstream schools and, as a result, ordering Wallace to pay Jupiter for work it did not perform on these projects. In its cross-appeal, Jupiter claims that the judge incorrectly ruled that Wallace properly removed the Osbornville school from the project. Only Wallace's arguments have merit.

Our review of a trial court's fact-finding in a non-jury case is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). However, questions of law are subject to plenary review on appeal with no deference granted to the trial court's conclusions. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). We also review mixed questions of law and fact de novo. In re Malone, 381 N.J. Super. 344, 349 (App. Div. 2005).

10

It is well established that "[t]he interpretation and construction of a contract is a matter of law for the trial court, subject to [our] de novo review on appeal." Cumberland Farms, Inc. v. N.J. Dep't. of Envtl. Prot., 447 N.J. Super. 423, 438 (App. Div. 2016) (citing Fastenberg v. Prudential Ins. Co. of Am., 309 N.J. Super. 415, 420 (App. Div. 1998)).  "Accordingly, we pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

Courts usually enforce contracts as written where, as here, the language of the agreement is unambiguous. Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960).  Indeed, unambiguous language controls the rights and obligations of the parties, even if it was unwise in hindsight. Karl's Sales and Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493 (App. Div. 1991).  Thus, a court "will not make a better contract for [the] parties than they themselves have seen fit to enter into, or alter it for the benefit of one party and to the detriment of the other." James v. Fed. Ins. Co., 5 N.J. 21, 24 (1950) (quoting Kupfersmith v. Delaware Ins. Co., 84 N.J.L. 271, 275 (E. & A. 1912)).  The parties, especially sophisticated ones like Wallace and Jupiter, are generally in the best position to determine their respective needs and obligations in negotiating a contract. Brundage v. Estate of Carambio, 195 N.J. 575, 601 (2008).

A-3981-18T3

Applying these principles here, we conclude that Wallace was permitted to delete Lake Riviera and Midstream from the subcontract without penalty for any reason, including the fact that Jupiter's expert services were no longer needed when the two schools were found to be asbestos-free. Section 5.2 is clear on its face. Read in a straightforward manner, this section provides that Wallace, as the contractor, may order Jupiter, its subcontractor, to make any changes, including deletions of work. There is nothing in Section 5.2 or anywhere else in the parties' agreement that limits Wallace's authority to make these changes, and the subcontract does not require Wallace to pay Jupiter for any schools that were deleted from the project.

Under these circumstances, the judge mistakenly considered Steven's brief testimony citing two examples of situations where Section 5.2 "could be" invoked. Extrinsic evidence of this nature should only be considered by a court in interpreting the terms of a contract where the parties' agreement is ambiguous. Conway v. 287 Corporate Ctr. Assocs., 187 N.J. 259, 268-70 (2006). That is simply not the case here, and neither party convincingly argues otherwise.

As already discussed, the judge also misinterpreted Steven's statement that Section 5.2 "could be" applied when there were "unforeseen conditions" necessitating the deletion of a school project or when Brick requested the

deletion. Contrary to the judge's conclusion, Steven made clear that he was not providing an exhaustive list of all of the many circumstances where a project could be deleted. Thus, while the possibility that the two schools would be found to be free of asbestos might not have been "unforeseen," this did not prevent Wallace from advising Jupiter that its expert services were not needed on these projects. Because Wallace had the authority under Section 5.2 to delete schools from the subcontract for any reason, the judge erred by declaring that a breach occurred when Wallace removed Lake Riviera and Midstream, and by awarding Jupiter damages for its lost profits and overhead for these schools.

For this same reason, the judge correctly found that Wallace did not breach the agreement by removing the Osbornville project, and he properly denied Jupiter's request for damages in connection with this removal. In so ruling, we recognize that the judge's decision on Osbornville, while correct, was based on his belief that Wallace had a "good reason" for deleting this school from the subcontract. While we disagree with the judge's analysis on this issue, it is well established that an appellate court is "free to affirm the trial court's decision on grounds different from those relied upon by the trial court." State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011) (citing Isko v. Planning Bd. of Livingston, 51 N.J. Super. 162, 175 (1968), abrogated on other grounds,

13                                                    A-3981-18T3

Commercial Realty & Res. Corp. v. First Atlantic Props. Co., 122 N.J. 546, 565 (1991)).

To summarize, we affirm the judge's decision denying Jupiter's request for damages concerning the Osbornville school. We reverse the judge's ruling awarding damages to Jupiter in connection with the work it did not perform at the Lake Riviera and Midstream schools.[3] We therefore remand this matter to the Law Division to enable it to amend the judgment to reflect the deletion of the award of damages to Jupiter in connection with the latter two schools.

## III.

We next turn to the parties' contentions concerning the PPA. Wallace argues that the trial judge erred by granting Jupiter $8794.82 in interest pursuant to the PPA on the $54,184.50 Wallace owed Jupiter for the work it performed at the Lanes Mill school. Jupiter asserts that the judge properly awarded it this interest, but mistakenly denied its request for attorney's fees under the PPA.

By way of background, the PPA establishes a strict timeframe pursuant to which payments are due from a prime contractor to a subcontractor which it has

---

[3] Based upon this ruling, we need not address the parties' respective contentions that the judge miscalculated the amount of damages that would have been owed by Wallace to Jupiter if there had been a breach of the subcontract. Because there was no breach by Wallace in deleting the three school projects, it is not liable for the payment of any damages to Jupiter on this issue.

retained to provide materials and services.  N.J.S.A. 2A:30A-2(a).  If these deadlines for payment are not met, and the subcontractor "has performed in accordance with the provisions of its contract with the prime contractor," penalties such as pre-judgment interest and attorney's fees may be imposed if the subcontractor files suit and is successful on its claims.  N.J.S.A. 2A:30A-2(b), (c), and (f).  However, the prime contractor may avoid these penalties if it provides the subcontractor with "a written statement of the amount withheld and the reason for the withholding," and "engage[s] in a good faith effort to resolve the reason for the withholding."  N.J.S.A. 2A:30A-2(d).

That is what occurred in this case.  At the end of the renovations, Wallace had not yet paid Jupiter for its work at Lanes Mill.  However, the parties disagreed as to the amount due, with Wallace asserting the figure was $54,184.50, and Jupiter claiming it was owed $55,500.  In addition, the parties were still battling over Jupiter's argument that it should be paid for the three schools that had been deleted from the contract.

Section 12.2 of the parties' subcontract provided that "[u]pon the partial or entire disapproval by the Contractor of the Subcontractor's application for payment, the Contractor shall provide written notice to the Subcontractor.  When the basis for the disapproval has been remedied, the Subcontractor shall be paid

the amounts withheld." In compliance with this provision and as required by the PPA, Wallace provided Jupiter with its written reasons for denying Jupiter's demands for payment, and the parties thereafter attempted to resolve their dispute by negotiating in good faith. They even participated in mediation. When they were unable to amicably adjust their differences, Jupiter commenced its lawsuit.

Under these circumstances, we detect no violation of the PPA on Wallace's part. Therefore, the judge mistakenly awarded Jupiter interest on the $54,184.50 he determined was due Jupiter for the Lanes Mill school. Because Jupiter failed to demonstrate that Wallace failed to comply with the PPA, Jupiter was also not entitled to attorney's fees and costs under that statutory scheme.

In addition, Jupiter could not claim attorney's fees under the "American Rule." "New Jersey strictly adheres to the 'American rule' in regards to attorney's fees," under which each party bears its own legal fees and costs. First Atlantic Fed. Credit Union v. Perez, 391 N.J. Super. 419, 425 (App. Div. 2007) (citing Van Horn v. City of Trenton, 80 N.J. 528, 538 (1979)). "Consistent with this policy, attorney's fees are not recoverable absent express authorization by statute, court rule or contract." Ibid. (citing State of New Jersey, Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 505 (1983)). Due to the inapplicability of

the PPA, there was no statute, court rule, or contract provision that allowed Jupiter to recover its attorney's fees and costs in this matter. Therefore, we affirm the judge's denial of Jupiter's request for reimbursement of these expenses.

In its cross-appeal, Jupiter also alleges that it was actually owed $55,500 for its work at Lanes Mill. However, the judge's determination that Steven adequately demonstrated that Jupiter was due the lesser amount is supported by sufficient credible evidence in the record and, therefore, we reject Jupiter's contention on this point without need for any additional discussion. R. 2:11-3(e)(1)(E).

Accordingly, we reverse the portion of the judgment that awarded interest under the PPA to Jupiter for the Lanes Mill school, and remand for the entry of a corrected judgment for the $54,184.50 the judge found Jupiter was owed for its work on this part of the project.[4] We affirm the judge's denial of Jupiter's request for attorney's fees and costs, albeit for different reasons than those expressed by the judge. See Heisler, 422 N.J. Super. at 416.

---

[4] Because the judge stated it was granting Jupiter interest on the Lanes Mill project under the PPA, he stated he would not consider whether Jupiter might be due interest on the award under Rule 4:42-11. Thus, on remand, the court may consider whether interest on this award is appropriate under Rule 4:42-11.

A-3981-18T3

IV.

In sum, we reverse the portions of the April 2, 2019 judgment awarding damages to Jupiter for the Lake Riviera and Midstream schools, and interest under the PPA for the Lanes Mill School. We affirm the judge's rulings denying Jupiter's claim for damages in connection with the Osbornville school, and its request for attorney's fees and costs under the PPA. We remand the matter to the Law Division to enable the court to expeditiously enter a revised judgment reflecting only the amount due to Jupiter for the completed work at the Lanes Mill school, after considering whether Jupiter is entitled to interest on that award under Rule 4:42-11.

Affirmed in part; reversed in part; and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3981-18T3