**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5362-18

LEONID SHCHEDRIN and
KONSTANTYN BONDAR,

     Plaintiffs,

and

IMPERIAL KURSK, LLC,

     Plaintiff-Appellant,

v.

GALINA and ARKADIY
STAR,

     Defendants-Respondents.

_____

Submitted February 10, 2021 – Decided July 6, 2022

Before Judges Accurso, Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Atlantic County, Docket No. C-000051-16.

Arnall Golden Gregory LLP, attorneys for appellant (Gene M. Burd, on the briefs).

Fox Rothschild, LLP, attorneys for respondents (Ely Goldin, of counsel and on the brief; Ciera A. Logan, on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

This is a dispute among business partners, all Russian nationals, over ownership of a residential property in Atlantic City. Plaintiff Imperial Kursk, LLC appeals from a final judgment and amended judgment on reconsideration following a ten-day bench trial. The General Equity judge dismissed Imperial Kursk and its sole member Leonid Shchedrin's complaint against defendants Galina and Arkadiy Star, determined title to 2 N. Montgomery Avenue is in Galina Star and awarded the Stars $63,923.29 on their counterclaim for unjust enrichment.[1] Imperial Kursk claims to accept the trial court's findings of fact but insists the judge committed legal error in deciding Galina acquired an ownership interest in 2 N. Montgomery at the time of purchase in 2014 and engaged in self-dealing in transferring the property to herself in 2015. The judge's legal conclusions, however, were based on factual determinations that turned on the credibility of the witnesses. Because our review of the record

---

[1] Because Galina and Arkadiy Star share the same last name, we refer to them by their first names throughout this opinion. We intend no disrespect by this informality.

A-5362-18

convinces us there is substantial credible evidence to support the judge's findings, we affirm.

Although a great deal of the parties' trial testimony, all taken through an interpreter, was at odds and there are no written agreements memorializing their business arrangements, they are in accord on how their relationship started. Plaintiff Leonid Shchedrin, a Russian citizen, owns a network of pawn shops in Russia and invests in real estate there and in the United States. Shchedrin does not speak English and was not physically present for the trial. His testimony was taken, out-of-turn, from his home outside Moscow via Skype. He is the sole member and owner of Imperial Kursk, which he formed in June 2013 as a Pennsylvania limited liability company. At the time, Imperial Kursk's business was the purchase and sale of antiques between the United States and Russia.

Defendants Arkadiy (Art) and Galina Star are purported to be dual citizens of Russia and the United States; they live here. Both speak English although they testified in Russian. Shchedrin and the Stars agree they met in 2013 in Russia and quickly became business partners. Art, who had already been buying and renovating residential properties in Atlantic City with Galina, encouraged Shchedrin to change his enterprise from antiques to real estate

3

based on their own experience buying, renovating, and renting property there. Shchedrin took Art's advice and, in September 2013, Imperial Kursk was registered as a foreign company in New Jersey with Galina as its registered agent.

The three agree that Galina and Art managed Imperial Kursk's day-to-day operations while Shchedrin continued to live in Russia. Shchedrin testified both Galina and Art worked for Imperial Kursk. Galina's duties included locating and buying properties in Atlantic City, advertising for tenants, and collecting rents. Shchedrin and the Stars testified Shchedrin orally agreed to compensate Galina by paying her fifteen percent of the rents received. Shchedrin testified Art was "his eyes," as to the repairs and renovations to the Atlantic City properties Imperial Kursk bought in 2013. According to Shchedrin, Art did not undertake any of the work himself, he only oversaw it.

Shchedrin claimed he and Art did not discuss Art's compensation for his efforts. Shchedrin testified he told Art he was "going to make it up to him, but first we needed to make sure that the renovations were complete." The Stars testified Art undertook a great deal of the manual labor necessary to renovate the properties and that Shchedrin orally agreed to pay Art twenty percent of

the costs of renovations. Shchedrin testified he never made any such agreement. Instead, he testified he "made it up" to Art in 2014 by buying Art a van and paying $12,000 to renovate the basement of the Stars home in Philadelphia.

The Stars countered that the van was purchased for the company but was put in Art's name because Shchedrin couldn't sign the financing documents because he lived in Russia. Although Art admitted Imperial Kursk made the car payments, he claimed he got stuck paying an additional $3,000 when he surrendered the van to the dealership after the parties' relationship ended. As to the basement renovations, the Stars claimed they were done to provide Shchedrin and his wife a place to stay on their visits to the States and Shchedrin offered no proof to establish he'd paid for any of it.

In August 2013, Shchedrin executed a power of attorney authorizing Art to act on behalf of Imperial Kursk to acquire real estate, to sell "any or all real estate" Imperial Kursk owned "upon such terms as [Art] shall think fit," and to manage, repair, alter, or improve any such real estate. The following August, Shchedrin granted Art another power of attorney, giving him the power to "[m]anage, control, and operate" Imperial Kursk, including the authority to make decisions regarding "sales, purchases, employees, loans, and equipment,"

"[e]nter into binding contracts on [Shchedrin's] behalf," and "[m]ake gifts from [Shchedrin's] assets" to specific people and organizations. The 2014 power of attorney explicitly stated that Art was not authorized to "gift, appoint, assign or designate any of [Shchedrin's] assets" to himself or any of his creditors. Shchedrin testified the signature on the 2014 power was not his. He claimed the document was signed by someone else, although he admitted witnessing the execution of the document via Skype from Russia. Shchedrin claimed he believed he was only extending the 2013 power of attorney and never intended to give Art broader powers in 2014.

Shchedrin testified he toured various properties in Atlantic City with Art, Galina, and a realtor when he visited the States in the summer of 2014, but claimed Art and Galina, not a realtor, showed him the property at 2 N. Montgomery during that trip. According to Shchedrin, the property was not in bad shape, although not in rentable condition. He agreed Galina could purchase the property for Imperial Kursk, but he was unwilling to fund any renovations for the time being. Shchedrin explained his and his wife's funds were tied up in a restaurant and banquet hall he had recently purchased in northeast Philadelphia that required extensive renovations. Shchedrin claimed he paid Art $400 a week for being "his eyes" in connection with the restaurant

renovations, while also claiming he was overseeing the renovations himself. According to Shchedrin, Imperial Kursk purchased 2 N. Montgomery, and "put it on standby while we [were] finishing up the renovations of the restaurant," with the understanding he would "revisit the idea of renting out that house" after the restaurant was up and running.

The Stars' testimony about the purchase of 2 N. Montgomery as well as Art's efforts in rehabbing Imperial Kursk's rental properties and the renovations of the restaurant was very different. Galina testified that in addition to looking for suitable rental properties for Imperial Kursk, she was also looking for a place where she and Art could live in Atlantic City. She found 2 N. Montgomery in August 2014, but the property was being marketed for an all-cash quick sale. Because she and Art lacked the funds for an all-cash deal, Galina testified she approached Shchedrin for help in acquiring the house — either by lending them the money or permitting them to pull out some of the money and sweat equity they had invested in Imperial Kursk. According to Galina, Shchedrin said he would help, and if she liked the house, "we'll find a way to make it happen." She claimed he eventually told her to "go head and buy the house from the company money," and they would later

A-5362-18

figure out "who owes what to whom," including what was due Art for the work he'd performed.

Galina testified the purchase price for 2 N. Montgomery was $118,000 plus settlement charges; she and Art put up nearly $21,000 of their own money and took $100,000 out of Imperial Kursk. According to her, she wanted to take title in both her name and the company name, reflecting the contributions of both to the purchase price. But the title agent — she was not represented by an attorney in the transaction — told her "it's not really proper to put down the name of the company and then an individual name." She claimed the agent told her "because you are part of this company and you have these documents proving it," he would "just write down c/o which will mean essentially the same thing so we agreed." Accordingly, title was taken in the name of Imperial Kursk, c/o Galina Star. Galina and Art both testified there was never any question but that they were buying the property for themselves to live in.

Galina testified the house was in a good location and large enough to be divided into a home for her and Art as well as a rental apartment, but was in a very dilapidated condition, thus the low price. Art testified the roof was partially caved in, resulting in birds nesting on the third floor, a number of the floors were rotten, the pipes in the plumbing and heating systems required

replacement, and there was standing water knee-deep in the basement, resulting in mold throughout. He claimed Shchedrin had no involvement in 2 N. Montgomery, other than authorizing the Stars to use money from Imperial Kursk to finance the purchase, and to his knowledge had "never set foot in it." Art testified it took months of effort and nearly $50,000 to make the building habitable, all of which he and Galina paid. The Stars testified Imperial Kursk contributed nothing to the rehabilitation of 2 N. Montgomery, and that they'd paid all the associated costs, including taxes, insurance and utilities, from the time of purchase through trial.

As to Art's efforts on behalf of Imperial Kursk, he testified he was responsible for virtually everything but renting the apartments, the work Galina did. He explained that Shchedrin only visited the States for a week at a time every three to four months and did so on a tourist visa. Art testified he was responsible for all the renovations at all three of Imperial Kursk's rental properties, which ran to hundreds of thousands of dollars, deciding what work needed to be done, developing budgets, hiring contractors, assisting and overseeing their work and arranging for inspections. Art testified he undertook a great deal of the work himself because he "felt that this was [his] business, too, and in a business, you cannot just waste money right and left." He

A-5362-18

testified that whatever he could do by himself, he "always did only by [him]self."

According to Art, Shchedrin promised he would receive twenty percent of the costs of the renovations to the Atlantic City rental properties, and that he and Galina would become fifty/fifty partners with Shchedrin in Imperial Kursk once they squared-up their contributions and the properties were all up and running. As to the restaurant and banquet hall Shchedrin decided to develop in Philadelphia, Art, who testified he had extensive experience in developing restaurants having spent ten years of his career doing so, claimed he didn't support the idea. According to Art, he told Shchedrin "the restaurant business is very hard. You need to be there 24/7." Art claimed he explained that if he were responsible for managing Shchedrin's restaurant in northeast Philadelphia, he wouldn't be able to manage Imperial Kursk's rental properties in Atlantic City.

Art testified Shchedrin told him he was going to buy the Philadelphia property notwithstanding, and that Art would only be involved in weddings for the catering hall; the restaurant and bar would be run by someone else. Shchedrin purchased the property in May 2014, and Art agreed to run the banquet facility. Art testified Shchedrin named it for him, calling it "Art's

Banquet." Shchedrin admitted it was called Art's Banquet, but testified he did not name the banquet hall for Art Star. Shchedrin claimed he came up with the name after seeing an article on an "art ballroom" in a magazine at the Four Seasons in Philadelphia where he stayed during one of his trips to the States. He claimed he thought "Art" was short for "artist" in English, and that "the banquet hall belongs to artists."

Although Art claimed he was to manage only the banquet hall and not the restaurant and bar, he testified he "had the full responsibility to launch [the entire] business so it would operate." He testified he found and hired the general contractor and other workers, acquired the appliances and equipment and found the chef and restaurant manager. According to Art, "it took from the end of 2013 to roughly May 2014 to get the Atlantic City properties to a point where they could be rented," and from May 2014 when Shchedrin purchased the Philadelphia restaurant property through May 2015, when Shchedrin sold it just before it opened, to get the restaurant and banquet hall operational. According to Art, Shchedrin never paid him the promised twenty percent of the renovations to the Atlantic City properties and the $400 weekly he finally began receiving in May 2014 was not for his work in connection

with the restaurant but pursuant to an agreement with Shchedrin relating to the rental properties.

Specifically, Art testified that when the renovations to the Atlantic City properties were essentially complete in May 2014, he "started conversations" with Shchedrin as to the twenty percent payment Shchedrin had promised, as Art had worked for nearly eighteen months without any compensation. Art claimed he and Shchedrin agreed Art would be in charge of maintenance for the three rentals and taking care of people moving in and out for which he would be paid $400 a week. Art testified that agreement, like the rest of those he and Galina entered into with Shchedrin, was not in writing. He claimed he and Galina had tried repeatedly to get Shchedrin to "prepare the paperwork with an accountant" documenting "how much money Galina invested in the company," and how much, if any, was still owed from the $100,000 they received from Imperial Kursk to purchase 2 N. Montgomery, but that Shchedrin kept putting them off.

According to Art, in August 2014, Shchedrin demanded the Stars make interest payments on the $100,000 from Imperial Kursk, which they did. Art testified Shchedrin was having money problems by that point because in addition to the $800,000 Shchedrin had spent to purchase the restaurant

12

property, he'd had to spend another $450,000 in renovations and the project was not nearly finished, forcing him to borrow an additional $320,000 at one percent monthly interest from a hard-money lender. During a vacation in St. Maarten the Stars took with Shchedrin and his wife in November 2014, Shchedrin suggested the Stars borrow against 2 N. Montgomery to obtain additional capital for the company. Galina testified she expressed a willingness to do so, but explained the property would have to be transferred solely to her name in order to permit her to obtain a loan using the property as security. Galina and Art both testified Shchedrin told her to go ahead and transfer the property to her name, which she did in January 2015. She claimed the loan Shchedrin wanted to take against the property never happened because the process took too long, and Shchedrin changed his mind.

Shchedrin testified he never gave Galina permission to transfer 2 N. Montgomery to herself, and he only learned of the transfer, and that the Stars were living in the property, in February 2015, when he was advised of both by Imperial Kursk's bookkeeper. Shchedrin testified he had started to "feel uncomfortable" with the Stars toward the end of 2014, although he admitted having vacationed with the couple for ten days in St. Maarten in November. Shchedrin explained "when you're being told things such as everybody loves

13

your houses, things are going great, we're doing great, and the money is coming in, but you are not seeing any physical money, you begin to feel uncomfortable." He claimed the relationship cooled, asserting there "wasn't anything particular or specific, but somehow they began to feel less friendly."

According to Art, the parties' relationship unraveled when Shchedrin presented him with a post-dated contract in 2015 purporting to document that Art had borrowed $680,000 from Shchedrin's wife. Art testified he complained to Shchedrin about being asked to sign, saying "Why should I be the only one who will sign it, we are doing business together, so let's sign it together. Why should I be responsible for that money as if I was the one who borrowed it." Art testified he "assumed that [Shchedrin] did not like that," because he stopped "cooperating with me." Art claimed Shchedrin told him he didn't need them any longer; the houses were up and running and the restaurant had been built. Art testified they "split ways" in May 2015 and Shchedrin sued them in January 2016, claiming they'd stolen 2 N. Montgomery from him.

In addition to the parties, two other fact witnesses of note testified. The realtor who represented Imperial Kursk in the purchase of a couple of the Atlantic City rentals and represented the Stars in the purchase of 2 N. Montgomery testified about working with Art and Galina and meeting

14

Shchedrin when he showed the parties various properties in Atlantic City. The realtor testified to the dilapidated condition of the properties on purchase and to seeing Art putting up sheetrock, working on the plumbing, and installing a water heater in one of the units. The realtor testified he had no contact with Shchedrin in relation to 2 N. Montgomery, and understood the Stars were buying it as their personal residence.

The bookkeeper for Imperial Kursk also testified — in Russian through an interpreter. She claimed 2 N. Montgomery was listed on Imperial Kursk's books as an asset of the company but that Galina had never paid over any of the $89,000 in net profits she received from the property. The bookkeeper could not explain why the company's books didn't reflect any expenses for 2 N. Montgomery.

The only non-fact witness to testify was the accountant the Chancery judge had appointed to conduct a forensic analysis of the three Imperial Kursk rental properties in Atlantic City as well as 2 N. Montgomery, over which the parties disputed ownership, "to determine the accounting, distribution of profits, waste and management" of the properties since 2013. He testified consistent with his report that Imperial Kursk was "funded by advances from Shchedrin-related sources." According to the accountant, from 2013 to the

A-5362-18

time of his analysis in 2018, Imperial Kursk reported overall losses of $678,610.30. He claimed, however, that after adjusting for losses and expenses attributable to the restaurant property, non-business expenses paid on behalf of Shchedrin and unrecorded rental income from 2 N. Montgomery as well as certain other "reclassifications," Imperial Kursk actually turned a net profit of $290,993.92.

The accountant testified that outside an immaterial commission check, there was no indication in the Imperial Kursk books that Art or Galina had been paid anything.[2] The books, however, did reflect a loan from Galina to Imperial Kursk of $73,550 in 2014, which was reduced by $38,000 in payments to third-parties charged to the loan and the balance zeroed out through journal entries in 2015.

As to 2 N. Montgomery, the accountant testified the property was "unusual" from an accounting perspective. Specifically, the accountant testified the property was purchased in 2014 and recorded on Imperial Kursk's books as an asset in the amount of $119,456.15, but there was no rental income or expense of any sort attributable to the property, including real estate taxes.

---

[2] Galina testified she took her fifteen percent out of the rents before depositing the net proceeds in an Imperial Kursk account.

The accountant, however, was able to secure a hand-written summary from Galina's counsel listing rent income through 2018 of $165,743, less expenses of $76,040 for a net profit of $89,703.

After hearing the testimony, the Chancery judge wrote a comprehensive sixty-four-page opinion finding in favor of Galina and Art, whom he found decidedly more credible than Shchedrin. The judge found both Stars reliable witnesses, finding their testimony reasonable and corroborated by the documents and the photographs of the properties in evidence. The judge specifically found Galina's testimony that Shchedrin told her to transfer 2 N. Montgomery to herself, subject to "squar[ing] up" later was believable, noting Galina answered questions forthrightly and was "not evasive, hostile, or defensive" in responding to questions from Shchedrin's counsel as well as her own. Shchedrin, in contrast, the judge found "defensive" and "not credible," deeming his testimony "self-serving" and beset by inconsistencies.

As to 2 N. Montgomery, the judge found the property "was not an asset of [Imperial Kursk], but rather the residential home of the [Stars]." The judge found Shchedrin agreed Imperial Kursk would advance the Stars $100,000 toward the purchase price, "subject to a final 'true up' at some later point in time," and noted Imperial Kursk's bookkeeper corroborated Galina's testimony

17

that the Stars tendered the remainder of the purchase price and paid the closing costs.

Acknowledging that "[o]riginally, the property was registered to both [Galina] and [Imperial Kursk] reflecting that both parties had an interest in the property," the judge found the Stars' subsequent $50,000 investment in renovations and payment of all carrying costs supported the Stars' claim to sole ownership. The trial court found particularly significant the court-appointed accountant's findings that while the property "was purchased in 2014 and was subsequently recorded as an asset on the [Imperial Kursk] books . . . [t]here were no improvement costs, carrying costs, rental income, or rental expenses . . . associated with the property" recorded on the company's books.

The judge also concluded Galina's transfer of the property to herself in January 2015 was "done with . . . Shchedrin's knowledge," which was "corroborated by . . . Shchedrin's own testimony . . . that he was aware of the transfer by February 2015." The judge also found that even if Shchedrin did not become aware of the transaction until February 2015 as he testified, there was no evidence he objected at that time, noting Shchedrin and the Stars continued to do business with each other for months afterwards, with Shchedrin even naming the banquet hall for Art — an explanation for the name

the judge found more credible than Shchedrin's "art ballroom" version. Relatedly, the judge found the Stars had never made any false representations to Imperial Kursk or Shchedrin about the title to 2 N. Montgomery, and thus rejected Imperial Kursk's fraud claim as unsupported.

As to Imperial Kursk's claim for unjust enrichment against the Stars, the judge found the claim barred by Shchedrin's unclean hands. See A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 246 (1949). Specifically, the judge stated Shchedrin "caused [Imperial Kursk] to pay a substantial amount for non-business expenses" he incurred, payments to third-parties were recorded as reducing the balance of Galina's loan to the company, Imperial Kursk "failed to record any wages paid to anyone associated with the company," and admittedly failed to keep its books in accordance with the tax laws.[3]

The judge ruled for the Stars on their counterclaim for breach of contract, finding they had an oral agreement with Shchedrin to find properties,

---

[3] The judge further found the evidence established Imperial Kursk's "managers" "potentially engaged in visa fraud, tax fraud, customs fraud, false notarizations, procurement of false witnesses, and possibly even money laundering" prior to the start of trial, referencing Shchedrin's activities on a tourist visa; certain customs declarations he may or may not have made when entering the country, and the possibility the bookkeeper notarized a forgery of his signature on Art's second power of attorney.

19

oversee projects, provide necessary manual labor, advertise, collect rents, and otherwise manage properties for Imperial Kursk, while Shchedrin would provide funding, finding Art was to be compensated at a rate of twenty percent of the construction costs for each of the rental properties, while Galina would be paid fifteen percent of the rental income.

Based on the evidence in the record and the accountant's review of Imperial Kursk's books, the judge calculated Imperial Kursk owed Art $49,362 for unpaid work at two properties and owed Galina $179,623.29 based on a proper accounting of monies she provided the company. To those sums the judge added the $3,000 penalty Art incurred when he returned the van leased on Shchedrin's behalf and a $1,300 penalty Galina testified she incurred when she canceled a cable contract in her name at one of the rental properties after the parties parted ways. The judge thus concluded Imperial Kursk breached its contract with the Stars, owing them $183,923.29. The judge reduced that award by the $100,000 Imperial Kursk advanced for the purchase of 2 N. Montgomery, thus completing the "true up" the parties had intended, and reduced it by a further $89,703, representing the amount Galina "deposited into her personal account [for] rents received from 2 N. Montgomery," leaving a balance of $5,779.71 from the Stars to Imperial Kursk. Based on those

A-5362-18

offsets, the judge denied the Stars' counterclaim for unjust enrichment. He also denied their counterclaims for declaratory judgment and dissolution of Imperial Kursk, finding they were not members of the company and did not have an equity stake in Imperial Kursk. The judge entered judgment in favor of Imperial Kursk in the amount of $5,779.71 based on the offsets.

The Stars filed a timely motion for partial reconsideration, arguing the judge erred in offsetting their damages award by the $89,703 in rental income for 2 N. Montgomery, pointing out that as the court found the property had always belonged to them, any rents should logically belong to them as well. Imperial Kursk cross-moved for reconsideration, arguing the Stars had "abandoned" their claim to the rental income from 2 N. Montgomery by having never pressed the claim at trial, making any award offensive to traditional notions of res judicata. It further contended the $20,000 representing the Stars' contribution to the purchase of 2 N. Montgomery should not have been added to their breach of contract damages and demanded judgment of $311,635.35 based on rental income withheld on other properties and other adjustments to Galina's loan account.

The judge agreed he had miscalculated the damages by reducing the sums owed to the Stars on account of rents received for 2 N. Montgomery,

finding the rents associated with that property, like the property itself, belonged to the Stars. Correcting that error resulted in judgment to the Stars of $83,923.29. The judge also agreed Imperial Kursk was correct that the $20,000 the Stars contributed to the purchase of 2 N. Montgomery should not have been included in their damages, and that aspect of its motion related back to the Stars' motion pursuant to Rule 1:6-3(b) (noting "[a] cross-motion relating to the subject matter of the original motion shall, if timely filed pursuant to this rule, relate back to the date of the filing of the original motion"), thereby reducing their award to $63,923.29. The judge rejected the balance of Imperial Kursk's motion as untimely pursuant to Rule 4:49-2 (providing a motion to reconsider or amend a judgment must be served "not later than 20 days after service of the judgment").

Imperial Kursk appeals, contending the judge erred in concluding the 2014 deed conveyed any interest to Galina by virtue of the deed to Imperial Kursk c/o Galina Star. Imperial Kursk further contends Galina had no authority to transfer Imperial Kursk's property to herself in January 2015, as neither she nor Art had been granted a power of attorney that would have allowed them to "self-deal" in the company's assets, and, it claims, the judge erred in concluding Shchedrin ratified or assented to the transfer by continuing

22

to do business with the Stars thereafter.  Finally, Imperial Kursk contends the trial judge erred by failing to address its res judicata argument made on its motion for reconsideration and failed to make findings as required by Rule 1:7-4.  We reject those arguments as without sufficient merit to warrant any extended discussion in a written opinion.  See R. 2:11-3(e)(1)(E).

Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: "'we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'"  In re Trust Created By Agreement Dated December 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).  Deference is especially appropriate in a case such as this one where "'the evidence is largely testimonial and involves questions of credibility.'"  Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).  Because the trial court "'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses."  Pascale v. Pascale,

113 N.J. 20, 33 (1988) (quoting Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)).  Because that judge's "'feel of the case' . . . can never be realized by a review of the cold record," N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 578 (App. Div. 2010) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)), factual "'findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence.'"  Seidman, 205 N.J. at 169 (quoting Cesare, 154 N.J. at 411-12).

Notwithstanding Imperial Kursk's protestations that its focus on this appeal is on the Chancery judge's legal errors, its arguments indisputably reduce to quarrels with the judge's fact-finding which we are simply in no position to reject.  There is no question but that the trial judge misspoke in saying the 2014 deed to 2 N. Montgomery was "registered to both" Imperial Kursk and Galina, "reflecting that both parties had an interest in the property." The 2014 deed was solely in Imperial Kursk.  But the error is of no moment because the judge's finding that 2 N. Montgomery was purchased by Galina and Art as their home and was not an asset belonging to the company was not based on the form of the deed.  It was based on Art and Galina's testimony that they purchased the house with funds advanced by Imperial Kursk with Shchedrin's express permission.

24

Because the judge believed Galina and Art that they bought the property for themselves to live in and rejected as false Shchedrin's claim that Imperial Kursk purchased it as a potential rental, the form of the deed is irrelevant. "Equity looks to the substance rather than the form." Applestein v. United Bd. & Carton Corp., 60 N.J. Super. 333, 348 (Ch. Div. 1960). As Judge Kilkenny explained in Applestein over sixty years ago, "a deed absolute on its face, if in truth a mortgage, will be treated in equity as a mortgage. This court of conscience never pays homage to the mere form of an instrument or transaction, if to do so would frustrate the law or place justice in chains." Ibid.

The judge found Galina and Art purchased the property as their home with $100,000 borrowed from Imperial Kursk, based on their testimony as well as the undisputed proof that they shouldered all the costs of the renovations and the property's upkeep, and thus he disregarded the form of the deed and gave effect to the substance of the transaction by reducing the Stars' damages award by $100,000, the amount Imperial Kursk contributed to the purchase. See Killeen v. Killeen, 140 N.J. Eq. 387, 387-89 (Ch. 1947), remanded on other grounds, 141 N.J. Eq. 312, 313-16 (E. & A. 1948) (finding married couple owned tavern despite husband's brother's name on the deed, because couple took physical possession, paid all carrying costs, rented portions of the

property, and testified brother took title on their behalf because they had "judgments" against them). We see no error.

Similarly, in arguing Galina lacked authority to transfer the property to herself in 2015 and breached her fiduciary obligation to it in doing so, Imperial Kursk ignores the judge's finding that Shchedrin authorized the transfer while the parties were vacationing in St. Maarten in November 2014. In addition, because the judge found Galina and Art were the actual owners of the property, they didn't need Shchedrin's power of attorney to transfer the property to themselves. The Stars didn't breach any fiduciary duty to Imperial Kursk by transferring the property to themselves because the company didn't have any ownership interest in it. Thus, Galina's actions did not damage Imperial Kursk or deprive it of a company asset. Because the judge's factual findings on the property's ownership are well-supported by the record and thus binding on appeal, see Seidman, 205 N.J. at 169, Imperial Kursk's legal arguments about the Stars' alleged self-dealing are unavailing.

Finally, we find no error in the court's order on reconsideration, which we review only for abuse of discretion. See Giannakopoulos v. Mid State Mall, 438 N.J. Super. 595, 599 (App. Div. 2014). Imperial Kursk does not challenge the court's finding that its cross-motion for reconsideration was

untimely under Rule 4:49-2, and thus that relief was necessarily limited to items relating to the subject matter of the Stars' motion under Rule 1:6-3(b).

As the Stars' motion was limited to reconsideration of the $89,703 offset for rents from 2 N. Montgomery, Imperial Kursk's request was necessarily limited to the calculation of damages relating to that property. Its argument that the court erred in including the $20,000 the Stars paid toward the purchase of the property in their damages, which the court conceded, clearly fell within that category, and the remainder of its affirmative requests, which, as best we can tell from the documents Imperial Kursk chose to include in its appendix, related to adjustments to Galina's loan account and rents from other properties totaling $311,635.35, clearly did not. As the judge set forth which portion of the cross-motion related back to the Stars' motion and rejected the remainder as time-barred, Imperial Kursk was provided a clear explanation of which aspects of the cross-motion were barred and why. Nothing further was required.

Imperial Kursk's argument that the Stars' claim to rents from 2 N. Montgomery was barred by res judicata by their having failed "to affirmative[ly] state a claim" for those rents at trial is plainly meritless. As the Stars retained the rents, we fail to see the basis on which they could have

27

asserted an affirmative claim to them at trial. The rents only became an issue for the Stars after trial when the court erroneously offset them against their damages. Because the judge's reason for reversing himself on that offset — the Stars' ownership of the property entitled them to the rents — is incontrovertible, denying the Stars the rents would have been obviously inequitable even if Imperial Kursk's res judicata argument had any merit, which it does not. See Trenton v. Howell, 132 N.J. Eq. 125, 130 (Ch. 1942) (observing "proceedings in equity are and should be conducted with less regard to mere matters of form and technical objections than proceedings at law"). We thus find no error in the court's failure to address the matter further.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5362-18