# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0962-22

ANDREW T. ZIDEL,

    Plaintiff-Appellant,

v.

LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP,

    Defendant-Respondent.

_____

Argued January 17, 2024 – Decided February 27, 2024

Before Judges Whipple, Mayer and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-2951-21.

Louis Anthnony Modugno argued the cause for appellant (Trif & Modugno, LLC, attorneys; Louis Anthnony Modugno and Brendan W. Carroll, of counsel and on the briefs).

Brian J. Molloy argued the cause for respondent (Wilentz, Goldman & Spitzer, PA, attorneys; Brian J. Molloy, of counsel and on the brief; Samantha Josephine Stillo and Richard Kenneth Wille, Jr., on the brief).

PER CURIAM

Plaintiff Andrew Zidel appeals from a judgment entered after a bench trial. We affirm in part, and remand for the court to further consider attorneys' fees and costs as outlined within.

Zidel joined the law firm of Lerner, David, Littenberg, Krumholz & Mentlik, LLP (Lerner David or the Firm) as a patent agent in 2001 and became an associate in 2003. Zidel became a non-equity partner in 2011 and an equity partner in 2012, when he was given one point to define the relative amount of his cash distribution from the partnership, above his biweekly draw. By the time he parted from the firm in early 2019, Zidel had been given a total of 4.5 points.

For its approximately fifty-year history, Lerner David operated without a comprehensive written partnership agreement. The Firm did, however, have written agreements that addressed specific issues pertinent to its partnership, such as point allocations, the appointment of a tax representative, and death and disability buyouts. Although not a written agreement, the Firm also had a formula for determining the amount of compensation that retiring partners received. As one former managing partner of the Firm testified at trial:

> There was and is now a formula which is utilized to come up with what was characterized and called an

adjusted capital account. I'm not sure in the last agreement if that's what we call it anymore. But[] there was a formula, the purpose of which was to try to determine the balance for accounts receivable as of the date of a partner's retirement and with what's in progress from which we would try to come up with a fair determination of a retirement benefit—

. . . .

—under the circumstances where it was warranted.

The formula was flexible and used as a guide before being coupled with an ongoing employment agreement or of counsel agreement wherein it was contemplated a retiring partner would continue to provide value to the firm.

The Firm determined it needed a written partnership agreement to address the issues of retiring and withdrawing partners in the future. A managing partner began drafting the Lerner David Partnership Agreement (LDPA) in late spring or summer of 2018. In late summer of 2018, a Lerner David managing partner asked Zidel and another junior equity partner to provide feedback on a draft of the LDPA. In October 2018, the Firm's leadership circulated a memo to the equity partners, seeking input on a draft of the LDPA. Between that point and December 20, 2018—when partners began to execute the LDPA—numerous equity partners provided feedback on the draft, and some of the comments were incorporated into the final version.

3

Throughout the lengthy process of drafts, comments, and redrafts, Zidel consistently provided negative feedback and objected to the language that limited the compensation due to partners who withdrew from the Firm to practice law elsewhere—as opposed to those who retired. In addition to objecting to the proposal declining to compensate departing partners for their equity shares, Zidel questioned whether the sections in question would violate Rule of Professional Conduct (RPC) 5.6(a), which prohibits agreements restricting the future practice of law. Even after the executive committee produced the final draft of the LDPA and partners began executing it, Zidel continued to object to those provisions.

In 2017, Zidel formed a "Next Gen" or Business Development committee at Lerner David to discuss methods for developing new business. By summer of 2018, that group was termed—by some—the "Mutiny Committee" and discussed proposing changes to the executive committee. Nothing came of the discussions and the Next Gen committee disbanded by August or September of 2018. By summer of 2018, Zidel actively pursued alternative employment.

In November 2018, he formed a partnership with two other Lerner David partners (CRZ, LLP)—even going so far as to sign a partnership agreement,

4

file paperwork of incorporation and open a firm bank account—all while maintaining his partnership status in Lerner David. In early December 2018, Zidel took a business trip to California—with expenses paid by Lerner David—to meet with a major Firm client about projects in development. On this trip, Zidel was accompanied by another Lerner David partner, who was also a partner in CRZ, LLP. Although he had received permission to bring an associate on the business trip, Zidel did not and, instead, made the trip accompanied only by his current and future partner. At trial, Zidel testified a managing partner at Lerner David had rescinded permission for the associate to travel, but that managing partner unequivocally denied doing so during his testimony.

Upon their return from California these two CRZ, LLP partners tendered their capital investments in the new firm, as required by the partnership agreement, but the third partner did not. CRZ, LLP collapsed shortly thereafter, and Zidel then reached out to another firm, Botos Churchill LLP, to inquire about a position. After a series of meetings, on December 31, 2018, Botos Churchill offered Zidel a partnership, and he accepted the position by return letter on January 1, 2019. Zidel resigned his position with Lerner David on January 3, 2019.

5

After departing the Firm, Zidel requested Lerner David buy out his equity share for fair value by paying him a percentage of the Firm's accounts receivable as they normally would a retiring partner. The Firm determined that, under the LDPA, Zidel was not due such additional compensation. After continued refusals, on August 5, 2019, Zidel filed suit in the Chancery court against Lerner David and twenty-two individual partners, raising a claim for specific performance and seeking a determination that his ownership interest be purchased at a fair value. Additionally, he asserted claims against defendants as an oppressed minority partner, including breach of fiduciary duty, and a demand for an accounting. Defendants filed an amended answer, and a counterclaim and third-party complaint[1] for breach of fiduciary duty, faithless servant, poaching of Lerner David employees, and disgorgement. Zidel answered the amended counterclaim on February 4, 2021, and moved for partial summary judgment as well, seeking a declaration from the Chancery court that he was "not bound by the terms of the [LDPA]" and the buyout provisions of the Uniform Partnership Act (UPA), N.J.S.A. 42:1A-1 to -56, controlled instead.

---

[1] The third-party complaint was against the Lerner David and CRZ partner who traveled to California with Zidel for client meetings. The third-party complaint was dismissed on March 18, 2021.

6

On February 19, 2021, the Chancery court judge issued an order and a statement of reasons denying Zidel's motion. Having determined that no equitable relief was sought, the Chancery court judge transferred the case to the Civil Division. A bench trial was held over six days in March and April 2022. The parties submitted written summations on May 6, 2022, and the trial judge issued an order and opinion on August 2, 2022, rendering a verdict of no cause of action on Zidel's complaint, inviting Lerner David to file an application for attorney's fees, and denying all other relief sought by the parties.

Lerner David filed a motion for attorney's fees that Zidel opposed. After arguments, the trial judge issued an order and opinion on October 21, 2022, wherein he ordered Zidel to pay defendants' attorneys' fees and costs totaling $830,185.47. On December 9, 2022, the trial judge further granted Lerner David's motion to unseal the October 21, 2022 order and also granted Zidel's motion for a stay pending appeal. This appeal timely followed.

"Reviewing a trial court's findings in a non-jury trial, the appellate court 'ponders whether . . . there is substantial evidence in support of the trial judge's findings and conclusions.'" Sipko v. Koger, Inc., 214 N.J. 364, 376 (2013) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)).

7

"Deference [to factual findings] is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Ibid. (alteration in original) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). The trial court's legal determinations, in contrast, are reviewed de novo. Id. at 379 (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

I.

Zidel argues the UPA governs his rights as a "limited partner[] in a limited [liability] partnership" because "there was no partnership agreement" between the parties. He advances statutory, common law, and textual arguments to assert that he is not bound by the terms of the LDPA and is, instead, subject to the UPA. Thus, Zidel contends, when the LDPA went into effect on January 1, 2019, he became a "dissociated equity partner" and was, thus, not subject to the terms of the LDPA. Because Lerner David did not have a partnership agreement in effect when he became "dissociated," Zidel asserts his relationship to Lerner David was governed by the UPA. He contends the UPA controls the relationship between him—as partner—and Lerner David—as partnership—due to a lack of written partnership agreement prior to January 1, 2019, and to the provision in the UPA that states, "[t]o the

extent the partnership agreement does not otherwise provide, this act governs relations . . . between the partners and the partnership." N.J.S.A. 42:1A-4(a).

The trial judge found Zidel's conduct during the drafting and reviewing process of the LDPA, as well as his efforts to withdraw from Lerner David prior to the agreement's effective date, demonstrated "in the clearest sense [Zidel's] understanding that he would be bound by [the LDPA's] terms." Because the trial judge held the LDPA applied to Zidel, depriving him of a claim for a buyout of his equity, the trial judge implicitly determined the UPA was not controlling.

Under settled New Jersey law, a written partnership agreement is not required to bind partners together in a partnership; all that is necessary to create a partnership is "the association of two or more persons to carry on as co-owners a business for profit." N.J.S.A. 42:1A-10(a). Once the partnership is in existence, the agreement under which it operates may be "written, oral, or implied." N.J.S.A. 42:1A-2 ("'Partnership agreement' means the agreement, whether written, oral, or implied, among the partners concerning the partnership, including amendments to the partnership agreement."). If the partnership agreement is "implied," it may then be inferred by examining the historical "course of conduct" between the partners and the partnership. See

9                                                                                              A-0962-22

Blut v. Katz, 13 N.J. 374, 382 (1953) (examining defendants' course of conduct to determine correct categorization of certain expenses when the partnership agreement did not address it). The United States Supreme Court has held that:

> [i]f the contract of partnership is silent [on an issue], . . . [the partnership's stance on that issue] may . . . be inferred from the actual[,] though exceptional[,] course and conduct of the business of the partnership itself, as personally carried on with the knowledge, actual or presumed, of the partner sought to be charged.
>
> [Irwin v. Williar, 110 U.S. 499, 505-06 (1884).]

Thus, even if a partnership agreement does not explicitly define a partnership's policy on a given issue, the partnership's course of conduct when faced with that issue in the past will suffice to negate the application of the UPA on that issue.

Lerner David operated without a written comprehensive partnership agreement for much of its fifty-year history. Although there was not one all-encompassing agreement in place, there were multiple focused agreements—such as, agreements for the appointment of a tax representative, the allocation of points among equity partners, as well as withdrawal and death benefits for partners. Moreover, the Firm had a historical practice of compensating retiring

10

partners using a general formula to provide a benchmark value, which was then adjusted up or down, depending on the circumstances of that partner's retirement. Only one equity partner ever withdrew from the firm (as opposed to retired), and that partner's compensation package was determined as part of a settlement to avoid litigation. Given the course of conduct and prior agreement, there is sufficient evidence in the record to demonstrate that Lerner David had, at the very least, an implicit partnership agreement addressing compensation for withdrawing and retiring partners. We, therefore, discern no error in the trial judge's determination that the UPA did not control in this case, and policies specific to Lerner David control instead.

Zidel contends the LDPA does not apply to him because he—in his role as partner—did not consent to it, and the UPA requires that an "act outside the ordinary course of business of a partnership and an amendment to the partnership agreement shall be undertaken only with the consent of <u>all</u> of the partners." [2] N.J.S.A. 42:1A-21(j) (emphasis added). Zidel argues his consistent criticism of terms of the LDPA and refusal to execute the written agreement demonstrate the absence of a manifestation of mutual assent by the

---

[2] Zidel stops short of arguing the LDPA is altogether unenforceable without the consent of all partners, instead only arguing the "the LDPA is only binding on those that agreed with the terms and signed the agreement."

parties to the same terms. Finally, Zidel asserts the terms of the LDPA itself preclude it from binding him, as it "constitutes the entire agreement and understanding between the [p]artners," and—according to Zidel—it "defines '[p]artners' as all equity partners in the Firm who sign the LDPA."

In determining Zidel was bound by the LDPA—despite having refused to execute it—the trial judge found overwhelming evidence Zidel understood he would be bound by the terms of the LDPA and cannot avoid the terms of that agreement. The trial judge found Zidel's having made innumerable pleas to have the LDPA changed so he would be rewarded for his already planned departure and his race to make his exit from the Firm prior to the commencement date of the LDPA demonstrated his understanding he would be bound by the terms of the final document.

We agree default provisions of the UPA do not control. We also agree Zidel's argument casting himself as a disassociated partner similarly fails, because the LDPA's definition of "[p]artner"[3] refers to current membership in the partnership and specifically leaves open room for future additions. There

---

[3] "WHEREAS, the Firm currently consists of the equity partners who have executed this Agreement in the below signature block, and in the future those new equity partners who execute an undertaking to be bound by this Agreement."

A-0962-22

are no provisions anywhere within the LDPA, that address the "admittance" or "exit" of partners, except to state that such "admittance" or "exit" of partners "shall not result in an involuntary dissolution of the Firm." The LDPA does not contain the authority to remove or add a partner, so failure to conform with its terms does not necessarily dissociate a partner.

The LDPA is an amendment to the Firm's implied partnership agreement—at least an amendment of a portion of that agreement. Zidel was already bound as a partner, whose relations with the partnership "are governed by the partnership agreement." See N.J.S.A. 42:1A-4(a). Again, there was no written partnership agreement that describes the process required to amend either the Firm's implicit partnership agreement or the narrowly focused agreements that were written. Thus, the Firm's amendment process must be inferred by examining its historical course of conduct in undertaking such changes.

During the trial, Lerner David co-managing partners testified as to processes they undertook to draft and amend some of the narrowly focused written agreements the Firm had adopted during Zidel's tenure at the firm. Keith Gilman testified he had prepared a draft of "an operating agreement that dealt with . . . tax issues" and then "circulated [it] to the other equity partners"

A-0962-22

for feedback, which he then incorporated. Gregory Gerwitz also testified as to the "procedure for compensating equity partners":

> [E]very two years, . . . the executive committee would make a recommendation to the equity partners with a new equity plan.
>
> . . . .
>
> [A]nd it would almost always . . . be a discussion that would follow for eventual approval hopefully. Not everyone would always agree of course, but we would move forward with that plan once we vetted it with everyone[,] and everyone understood each other.

Thus, the practice at Lerner David was for a draft to be produced by an authorized individual within the Firm, for circulation among the equity partners. The partners would then provide feedback, discussions would take place, and revisions would be incorporated. As a managing partner testified:

> Q: Are there votes taken at equity partnership meetings?
>
> A: Yeah, votes in the sense—there have been votes, but . . . many times it's all built on consensus. And, . . . the executive committee works hard at making reasonable decisions, so they . . . tend to move through and . . . get consensus.

Once "everyone understood each other," the agreement would be finalized and executed by the equity partners. For the narrow agreements, or amendments,

14

A-0962-22

in the past, universal agreement among the partners was not necessarily required to finalize a document, although universal execution was standard prior to the LDPA.

The question thus remains whether Zidel's missing signature is sufficient to prevent the LDPA from taking effect as an amendment to the understood Lerner David partnership agreement. Zidel's refusal to sign the LDPA was insufficient to negate the wishes of all the rest of the equity partners. The LDPA adoption process substantially complied with the historical course of conduct of the Firm's prior agreement ratification procedures, and Zidel's own actions demonstrated his intention to relinquish the rights and responsibilities of a Lerner David partner.

We conclude as the trial judge did, the LDPA was adopted by the equity partners of Lerner David as an amendment to their implicit partnership agreement and took effect on January 1, 2019, as to all equity partners of the Firm, regardless of whether they had executed the document. Zidel's purported "clear understanding" he would be bound by the LDPA after January 1, 2019, is irrelevant to the analysis; what is determinative is the fact he had not renounced his position as an equity partner before the effective date. So long as he remained an equity partner, he remained bound by "the agreement,

15

whether written, oral, or implied, among the partners concerning the partnership, including amendments to the partnership agreement." See N.J.S.A. 42:1A-2.

Under the LDPA, Zidel is not due any additional compensation beyond his share of the accrued capital account, which he was already paid.

II.

Next, Zidel argues he did not breach his fiduciary duties as defined in the UPA, see N.J.S.A. 42:1A-24, and his ethical obligation, imposed by the RPC, to inform his clients of his resignation cannot be a breach of his fiduciary duty. Zidel avers his obligation to best serve his clients' interests required careful planning before leaving Lerner David and the actions he took to purportedly safeguard his clients' interests did not constitute breach of a partner's fiduciary duty. See Jacob v. Norris, 128 N.J. 10, 31-32 (1992).

Zidel argues the trial judge erred when analyzing his duty of loyalty by referencing New Jersey law regarding the loyalty owed by an employee to an employer, an officer or director to a corporation, or an agent to a principal. Zidel also asserts his post-resignation communications to his clients cannot serve as a breach of fiduciary duty, as that requires, as an essential element, proof of injury and damages to Lerner David. Finally, Zidel argues his

objections to the LDPA cannot be considered breaches, because he was raising concerns that extended beyond his own interests. He contends the court's findings of fact cannot support a breach of any duty imposed by the UPA or the RPC.

When the trial judge found Zidel breached his fiduciary duty to the Firm, the judge did not consider this breach in the context of the Firm's counterclaim for relief, but instead in the equitable sense as to whether Zidel came to court with unclean hands. Some factual findings the trial judge considered in finding a breach of fiduciary duty included:

> Zidel persistently tried to influence the provisions of the LDPA that would benefit withdrawing partners while concealing his plans to withdraw as a partner in the near future;
>
> Zidel traveled to harvest new work with Lerner David clients, all-expenses paid by Lerner David, while concealing the significant steps he had recently taken toward leaving Lerner David and forming his own partnership;
>
> Zidel apparently manipulated this client visit so that the only attorneys from Lerner David that attended the work-harvesting meetings were partners who were planning to leave the Firm to form their own partnership that was intended to provide similar legal services; and
>
> Zidel emailed some of Lerner David's clients to inform them of his departure and his joining a new

17

firm, without permitting Lerner David to approve the emails, while still receiving compensation from Lerner David.

The trial judge found "there is nothing short of a tsunami of evidence that Zidel completely and in every way possible breached his fiduciary responsibility to Lerner David as an equity partner." He considered Zidel's testimony, at times, unworthy of belief.

In evaluating the fiduciary duty a partner owes to a partnership, the appropriate standard was clearly stated last century by then-Judge Cardozo: "[C]opartners[] owe to one another, while the enterprise continues, the duty of the finest loyalty. . . . Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Meinhard v. Salmon, 164 N.E. 545, 546 (N.Y. 1928). The trial judge's error, therefore, in using an employee-employer standard to analyze Zidel's fiduciary duty to the partnership is harmless, because Zidel should have been held to an even higher standard of loyalty, which ultimately makes his breaches even more egregious.

The factual findings made by the trial judge demonstrate Zidel breached his fiduciary duty to the Firm and were supported by sufficient credible evidence at trial—mostly from Zidel's own testimony. Additionally, the trial judge's credibility determinations are due deference. Because his finding of a

18

breach of fiduciary duty is not a basis for Lerner David's relief, but rather an equitable bar for Zidel's relief, the question of damages Zidel raised is irrelevant.

Finally, Zidel argues the trial court judge's decision to award attorneys' fees and costs to Lerner David should be reversed because he "did not commit a 'fraud on the court,'" and "there is no evidence to support a finding of perjury." Zidel asserts the relevant rules and statutes do not support an award of attorneys' fees and advances equitable and fact-based arguments to support a reduction in fees.

The trial court awarded attorneys' fees and costs based on Zidel's "attempt[s] to defraud the [c]ourt through false or otherwise deliberately misleading testimony," and because Zidel "'should have known' that his complaint 'was without any reasonable basis in law or equity,'" and was, therefore, frivolous.

We review a trial court's decision to grant attorneys' fees under an abuse of discretion standard. Litton Indus. v. IMO Indus., 200 N.J. 372, 386 (2009). Similarly, the taxing of incurred costs is reviewed for an abuse of discretion. Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J. Super. 557, 570 (App. Div. 2007), aff'd, 194 N.J. 212 (2008). We reject Zidel's arguments the

19

amount of attorneys' fees awarded should be reduced because the Firm was not awarded any damages on the counterclaims.  However, we question the validity of the grounds for the fee award and remand for further findings.

Zidel argues an award of attorneys' fees based on the Firm's assertion he committed perjury is wrong, because he did not commit perjury as a matter of law.  He argues the trial judge's determination he was not credible is insufficient to establish perjury to the extent required to demonstrate a fraud on the court and support an award of attorneys' fees.  The trial judge found that, "[b]ased on both his testimony given at trial in the face of clearly contradictory evidence and the arguments presented by [defendant], Zidel's false testimony serves as a valid basis" for awarding attorneys' fees.

Although we defer to the trial judge's credibility assessments, we review his legal determinations de novo.  A fraud on the court occurs "where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Triffin v. Automatic Data Processing, Inc., 411 N.J. Super. 292, 298 (App. Div. 2010).  Fraud on a court does not require reliance by the court on

the misrepresentation. Ibid. A trial judge's finding of fraud on the court "must be supported by its own findings of fact." Id. at 306. Thus, "[we] should not disturb" the trial judge's finding of fraud on the court "unless [] convinced that [the finding is] so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Id. at 305 (internal citation omitted).

Zidel argues the trial judge's award of attorneys' fees and costs was procedurally deficient. He asserts Lerner David's application for attorneys' fees did not "comply with the 'safe harbor' provision of Rule 1:4-8" and, even if the "safe harbor" requirement had been satisfied, "there is no evidence, and the court did not find" he filed the complaint frivolously or solely to harass, delay, or cause malicious injury to Lerner David, as is required to "assert[] . . . costs and fees against a party other than a pro se party pursuant to N.J.S.A. 2A:15-59.1." See R. 1:4-8(f).

The trial court judge explained he awarded attorneys' fees and costs because Zidel's "litigation was frivolous," as he "brought this action to court with patently unclean hands," and he "'should have known' that his complaint 'was without any reasonable basis in law or equity.'" The trial judge also emphasized N.J.S.A. 2A:15-59.1(a)(1) "explicitly provides[] the determination

as to whether litigation is frivolous may be made '<u>at any time</u>' during proceedings." (Emphasis in original).

New Jersey's Frivolous Litigation Statute, N.J.S.A. 2A:15-59.1, serves a dual purpose. <u>Toll Bros., Inc. v. Twp. of W. Windsor</u>, 190 N.J. 61, 67 (2007). The statute serves both "a punitive purpose, seeking to deter frivolous litigation," and "a compensatory purpose, seeking to reimburse 'the party that has been victimized by the party bringing the frivolous litigation.'" <u>Ibid.</u> (quoting <u>Deutch & Shur, P.C. v. Roth</u>, 284 N.J. Super. 133, 141 (Law Div. 1995)).

> The statute permits a court to award reasonable counsel fees and litigation costs to a prevailing party in a civil action if the court determines "that a complaint, counterclaim, cross-claim[,] or defense of the non[-]prevailing person was frivolous." N.J.S.A. 2A:15-59.1(a)(1). A complaint, counterclaim, cross-claim, or defense is deemed frivolous if it was "commenced, used[,] or continued in bad faith, solely for the purpose of harassment, delay[,] or malicious injury," N.J.S.A. 2A:15-59.1(b)(1), or if "[t]he non[-]prevailing party knew, or should have known, that the complaint, counterclaim, cross-claim[,] or defense was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification[,] or reversal of existing law," N.J.S.A. 2A:15–59.1(b)(2).
>
> [<u>Ibid.</u>]

When applying this statute, courts must interpret "frivolous" restrictively to ensure that fee applications are not granted too frequently and "citizens are not dissuaded from accessing the courts." DeBrango v. Summit Bancorp, 328 N.J. Super. 219, 226 (App. Div. 2000) (citing McKeown–Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 561-62 (1993)). The Legislature carefully crafted the statute to balance the need to "deter baseless litigation" against the desire to "do so without discouraging honest, creative advocacy." Id. at 226-27 (citing Ellison v. Evergreen Cemetery, 266 N.J. Super. 74, 85 (App. Div. 1993)). Attorneys must be free to advocate for reasonable extensions of law without unreasonable fear that they or their clients may face sanctions because of it.

To that end, the associated court rule, Rule 1:4-8, describes a procedure for providing notice to the allegedly offending party and a demand for withdrawal, before the opposing party may bring a motion seeking attorneys' fees. Rule 1:4-8(b) requires the fees application "include[] a certification that the applicant served written notice and demand pursuant to [Rule] 1:5-2 to the attorney or pro se party who signed or filed the paper objected to [as frivolous or in bad faith]." This notice and demand must include, among other things, "notice . . . that an application for sanctions will be made within a reasonable

time thereafter if the offending paper is not withdrawn within [twenty-eight] days of service of the written demand." R. 1:4-8(b)(1)(iv). A later sub-section then extends the requirement for this "safe harbor" procedure "to the extent practicable" to "apply to the assertion of costs and fees against a party other than a pro se party pursuant to N.J.S.A. 2A:15-59.1." R. 1:4-8(f).

In fashioning Rule 1:4-8, the Supreme Court of New Jersey created "timeframes for bringing frivolous behavior to the attention of the offending party, . . . so that the behavior could be corrected promptly and litigation costs kept to a minimum, thereby preserving judicial, lawyers', and litigants' resources." Toll Bros., 190 N.J. at 71. Absent the serving of a notice and demand, "the applicant [faces the] risk of forfeiting recompense for defending against allegedly frivolous litigation conduct for which the offending person was not put on notice." Id. at 72. For without notice that their papers may be frivolous, neither the allegedly offending party nor their zealously advocating counsel has incentive to withdraw said papers.

When this "safe harbor" provision is extended to apply to a party—as opposed to an attorney or a pro se party—Rule 1:4-8(f) softens the procedure to only be required "[t]o the extent practicable." As such, "a court that hears an application against a party [must] assess whether it is practicable under all

the circumstances to require strict adherence to the requirements of <u>Rule</u> 1:4-8." <u>Toll Bros.</u>, 190 N.J. at 72.  The inverse of this requirement is that, if the requirements of <u>Rule</u> 1:4-8 are not met, a court must assess whether it was impracticable to meet the requirements.  "The most fact-sensitive aspect of such an inquiry undoubtedly will involve compliance with the safe harbor requirement that is designed to bring an early stop to offending behavior." <u>Ibid.</u>  "By insisting on compliance as soon as practicable, the salutary benefits of adhering to the notice requirement will more promptly rid the judicial forum of frivolous litigation behavior and will concomitantly provide reimbursement for the fees and costs actually attributable to an adversary's uncorrected offending conduct." <u>Ibid.</u>

Here, Lerner David did not comply with the "safe harbor" provision, nor did the court issue an order to show cause and give Zidel an opportunity to withdraw his complaint.  No one raised the issues of bad faith or frivolous litigation before the trial judge invited Lerner David to apply for attorneys' fees in his post-trial order and opinion dated August 2, 2022.  That procedural failure in itself may not be fatal to the claim for fees, though, if it was not "practicable" to conform to the <u>Rule</u>'s "safe harbor" requirement.  <u>See</u> <u>Toll Bros.</u>, 190 N.J. at 72.  The trial court should determine whether it was

25

practicable for Lerner David to serve notice and demand on Zidel as required by the Rule and, if so, when. The amount of the award may then need to be adjusted accordingly: "If a court determines that compliance could have occurred earlier, the sanction should be reduced concomitantly . . . . If the court determines that compliance was practicable from the time ordinarily required under the Rule, [and the applicant did not comply,] relief may be denied in its entirety." Id. at 72-73.

The point at which it became practicable for Lerner David to serve notice and demand on Zidel was the point at which Zidel's actions in pursuing the litigation ceased to be "objectively reasonable under the circumstances." DeBrango, 328 N.J. Super. at 227 (citing Ellison, 266 N.J. Super. at 85). For instance, in DeBrango, we determined the plaintiffs commenced their litigation in good faith, despite deposition testimony that seemed to undercut their claim, when circumstances made it reasonable for them to doubt this testimony. 328 N.J. Super. at 228. The litigation became frivolous, though, when the plaintiffs received documentary evidence from the defendants that corroborated this suspect testimony but still chose to proceed with the lawsuit. Id. at 227-28.

Here, the trial judge repeatedly asserted Zidel "knew or should have known" that his lawsuit "was without any reasonable basis in law or equity." Lerner David was in a similar position, however. Prior to trial, the Firm had access to substantial evidence that showed the extent to which Zidel breached his fiduciary duty to the Firm and had unclean hands. Lerner David had all the facts and case law Zidel had with which they may have surmised Zidel's litigation was purportedly "without any reasonable basis in law or equity." It was, therefore, as practicable—if not more so—for Lerner David to serve Zidel with a notice and demand to withdraw his lawsuit as frivolous before trial commenced, as it was practicable for Zidel to withdraw his lawsuit of his own accord. And the New Jersey Supreme Court has held that the applicant for fees bears partial responsibility under Rule 1:4-8 to put the offending party on notice. See Toll Bros., 190 N.J. at 72 ("Noncompliance [with the 'safe harbor' provision] places the applicant at risk of forfeiting recompense for defending against allegedly frivolous litigation conduct for which the offending person was not put on notice."). The dual purpose of the Frivolous Litigation Statute is not only to punish the pursuit of frivolous litigation, but to also avoid such litigation as much, and as early, as possible.

27

Additionally, the Frivolous Litigation Statute provides the award of "reasonable litigation costs and reasonable attorney fees" is conditioned on the judge's "find[ing] at any time during the proceedings or upon judgment that a complaint . . . of the non[-]prevailing person was frivolous." N.J.S.A. 2A:15-59.1(a)(1). Here, the trial judge did not find "at any time during the proceedings or upon judgment" that Zidel's litigation was frivolous. The trial judge found Zidel was bound by the LDPA, and had unclean hands, as he had "completely and in every way possible breached his fiduciary responsibility to the [Firm]," potentially implying that the litigation was frivolous. The trial judge made no specific finding, however, that such criticisms rose to the level of frivolity. The terms "in bad faith" and "frivolous litigation" did not appear in the trial judge's order or opinion dated August 2, 2022. The trial judge simply invited Lerner David to apply for attorneys' fees, without stating the grounds upon which such relief may be available.

In sum, the trial court did not make independent findings of fact, supported by sufficient evidence, that Zidel had indeed committed perjury and a fraud on the court. The trial judge did not determine Zidel's litigation was frivolous at a point in time when he could have withdrawn his complaint.

28

Neither the Firm nor the trial judge issued a notice and demand or order to show cause to Zidel asserting that his lawsuit was frivolous.

Thus, we conclude, the award of attorneys' fees should be remanded for more in depth consideration and findings regarding whether Zidel committed perjury—or is only a discredited witness—and whether and when it was practicable for defendants to conform with the procedural requirements of Rule 1:4-8. If the court finds it appropriate after those findings, the award of attorneys' fees may be adjusted accordingly.

Affirmed in part, remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0962-22